**UNITED STATES of America, Plaintiff,**

v.

**Nathan S. JIM, Jr., Defendant.**

**No. CR 92–87–RE.**

United States District Court,
D. Oregon.

March 13, 1995.

Kristine Olson Rogers, U.S. Atty., D. Or., Robert B. Ross, Asst. U.S. Atty., Portland, OR, Joseph R. Perella, Wildlife & Marine Resources Section, Environment & Natural Resources Div., U.S. Dept. of Justice, Washington, DC, for U.S.

Celeste C. Whitewolf, Portland, OR, for Nathan S. Jim, Jr.

## OPINION

REDDEN, District Judge:

The Ninth Circuit Court of Appeals remanded this case for consideration of Nathan S. Jim, Jr.'s religious freedom claim under the newly enacted Religious Freedom Restoration Act (RFRA), 42 U.S.C. §§ 2000bb–2000bb–4 (1993). An evidentiary hearing was held on October 20 and 21, 1994, and briefing was completed on February 17, 1995.

### PROCEDURAL BACKGROUND

In December 1992, Jim was arrested for killing two golden and two bald eagles in eastern Oregon. Following this court's denial of his motion to dismiss under the test set forth by the Supreme Court in *Employment Div., Dept. of Human Resources v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), Jim pled guilty to violating the Bald and Golden Eagle Protection Act (BGEPA), 16 U.S.C. § 668(a) (1988) and the Endangered Species Act (ESA), 16 U.S.C. §§ 1531–1543 (1988).

After Jim's plea, Congress passed RFRA, restoring the compelling interest test that had been applied by the Court before *Smith*. In this case, the government does not contest that RFRA can be applied retroactively. The purpose of this remand is to consider whether prosecution of Jim violates RFRA.

### FACTUAL BACKGROUND

Jim, an enrolled member of the federally recognized Confederated Tribes and Bands of the Yakama Nation, has been arrested twice for killing bald and golden eagles. In

1990, Jim was arrested for killing seven golden eagles. In both instances, Jim told law enforcement officials that he killed the birds for religious purposes.

Jim is a practitioner of three religions: Washaat, Feather (Was-lick-i) and the First Native American Church. Jim Affidavit, 2. Uncontradicted testimony at the hearing revealed that the use of eagle feathers and parts (e.g. wing bones) is necessary for the practice of these religions. *See* Testimony of Wilson Bob Wewa, Jr., Robert Olney, Nathan Jim, Jr. and Prosanna Williams.

At the hearing, Jim testified that he killed the eagles in 1992 to fulfill the request of his religious elders to obtain eagle feathers for burial use. Tr. 90–92, 133. He needed "clean" birds that had not been electrocuted, poisoned or "contaminated," and that had been "gathered by someone who ask[ed] for [their lives]." *Id.* at 92. To Jim, killing eagles is a religious ceremony involving prayer. *Id.* at 92–93. He later admitted that any eagle can be used for religious purposes, but he reaffirmed that killing eagles is a religious ceremony. *Id.* at 115–116. Jim testified that the Creator allows him to kill 12 eagles per year, enough to satisfy his elders' annual requests for burials. *Id.* at 133–34.

Each of the Indians who testified at the hearing agreed that eagle feathers are necessary for religious exercise and are in short supply. Unlike Jim, however, Wilson Bob Wewa's religious practices do not require the killing of eagles, nor do they require "clean" eagles. *Id.* at 35. To him, feathers from an eagle that has been electrocuted or poisoned can be used, but greater care and prayer is required to bless the feathers for religious use. *Id.* at 35–36, 162. As Wewa testified, cleaning "unclean" feathers can lead to greater blessing from the Creator because of the time and energy sacrificed in cleaning. *Id.* at 36.

Wewa criticized Jim's killing of four eagles as "wanton destruction which is against the principle of the Creator to have reverence for all living things." *Id.* at 48. Wewa believes that the killing of four eagles is inconsistent with a religious duty to be a steward of the Earth. *Id.* at 48–50.

## STATUTORY FRAMEWORK

The BGEPA prohibits, among other things, taking or possessing bald or golden eagles without a permit. 16 U.S.C. § 668(a). The ESA also prohibits the possessing or taking of bald eagles, a threatened species in Oregon, without a permit. 16 U.S.C. § 1538(a); 50 C.F.R. §§ 17.41, 17.32, 17.21.

An Indian may receive golden or bald eagle carcasses, parts or feathers through a permit system run by the U.S. Fish and Wildlife Service (FWS). The permit application requires an Indian to list: the species and number of eagles requested; where the eagle will come from; name of tribe the applicant belongs to; name of the tribal religious ceremony; certification from the Bureau of Indian Affairs (BIA) of Indian status; and certification from the applicant's religious group that the applicant is authorized to participate in ceremonies.

The permit application is submitted to the FWS. There, it is reviewed for completeness. FWS does not make any inquiry into the religious certification, but merely confirms that it has been signed. On average, the Portland FWS reviews the application in 12.2 days. Tr. 285.

Next, the application is sent by the FWS to the BIA. The BIA confirms the applicant's status as an Indian. If the certification is not signed by the proper BIA official, the BIA sends the application to the appropriate official for signing. On average, the application remains with the BIA for 26.4 days. *Id.*

The application is then returned to the FWS. The FWS sends an order to the national eagle repository in Ashland, Oregon. Dead eagles are collected from FWS agents throughout the nation and sent to the repository. The director logs the requests on a first-come, first-served basis. On average, the repository fills requests for feathers in two weeks, for parts in six months to one year, and for carcasses in 18 months. Informally, the director will expedite "emergency" feather requests.

A permit to take a bald or golden eagle can only be issued if the FWS determines

that the kill is "compatible with the [eagle's] preservation." 50 C.F.R. § 22.22(c)(1). According to the testimony of David McMullen, the District FWS Director, only the Director of FWS has the authority to grant such a permit.

## DISCUSSION

With the enactment of RFRA, Congress intended that the courts apply pre-*Smith* case law in determining whether a statute interferes with free expression of religion. 42 U.S.C. §§ 2000bb(a)(5), (b)(1).

█ In determining whether the BGEPA or the ESA violates Jim's rights under RFRA, three elements are considered: whether the laws substantially interfere with Jim's free exercise of religious beliefs; whether the laws promote a compelling state interest; and the extent to which recognition of an exemption from the statute would impede the objectives that the state seeks to advance. *Callahan v. Woods*, 736 F.2d 1269, 1273–74 (9th Cir.1984). Jim bears the burden of establishing the first element, while the government bears the burden on the second and third elements.

### 1. *Substantial Burden on Jim's Free Exercise*

#### A. *Standing*

█ The government argues that Jim does not have standing because Jim's religious practice has not been burdened. Specifically, the government contends that Jim is not credible in claiming that he killed the eagles as a religious act to provide feathers to his elders.

Jim testified at the hearing that obtaining the birds for his elders and the act of shooting were religious practices. Prosanna Williams, an elder, testified that she would not have asked Jim specifically to "kill" eagles, but that she would have asked Jim to get her feathers. The testimony of Wewa and Williams established that obeying the requests of elders is fundamental in Indian religious practices.

While no other Indian testified that he or she personally believes that the act of shooting eagles is religious, Jim need not establish that his religious beliefs are shared with others. *See Thomas v. Review Bd. of Indiana Empl. Sec. Div.*, 450 U.S. 707, 715–16, 101 S.Ct. 1425, 1430–31, 67 L.Ed.2d 624 (1981). Nonetheless, there is some corroboration of Jim's professed belief in the record. Robert Olney testified that there are religious ceremonies to kill eagles. Tr. 74–76.

While I agree with the government that Jim's testimony was, at times, contradictory and confused, I credit his claimed beliefs. The evidence is sufficient to establish that his religious practices—shooting eagles and providing eagles to his elders upon request—are at issue in this case.

### 2. *Illegal Possession*

█ Jim argues that he pled guilty to possessing, but not taking, eagles. I agree with the government that Jim pled guilty to illegally possessing eagles, which includes possessing eagles taken without a proper permit. 16 U.S.C. § 668(a); 16 U.S.C. § 1538(a)(1)(D); 50 C.F.R. § 17.21(d). He did not have a permit to take eagles. Therefore, his possession of illegally taken eagles was prohibited by the BGEPA and ESA.

### 3. *Substantial Burden*

The government argues that Jim's free exercise was merely inconvenienced and not substantially burdened by the law. It contends that Jim made no effort to determine if the permit system could accommodate his religious needs.

█ The government correctly notes that mere inconvenience is insufficient. *Graham v. C.I.R.*, 822 F.2d 844, 850–51 (9th Cir.1987), *aff'd*, 490 U.S. 680, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989). The laws must interfere with a tenet or belief that is central to religious doctrine. *Id.*

In *United States v. Thirty–Eight Golden Eagles*, 649 F.Supp. 269 (D.Nev.1986), *aff'd*, 829 F.2d 41 (9th Cir.1987), the court held that because eagle feathers hold such an exalted status within Indian religions, "*any* scheme which limits the access of the faithful to their talisman must be seen as having a

profound effect on the exercise of religious belief." *Id.* at 276.

*Thirty–Eight Golden Eagles* is too broad. The particular facts of this case must be examined in light of the BGEPA and the ESA to determine if the law substantially burdens Jim's ability to practice his religion.

■ Jim testified that killing eagles is a religious act. The Creator allows him to kill up to 12 eagles per year: the number of eagles necessary to adequately supply feathers for his elders' burials. He testified that he needed to hunt the eagles, rather than waiting for repository birds, because he needed "clean" eagles (not killed from electrocution or poisoning) and could not wait for repository birds. In addition, he testified that he needed eagles that were killed in a religious exercise by a person with the eagle spirit.

Jim never applied for a permit to kill eagles lawfully. If he had applied and been granted a permit by the Director of FWS to kill 12 eagles per year, his religious exercise would not have been substantially burdened. I am convinced, however, that Jim would not have been granted a permit to kill 12 eagles per year.

For at least ten years, no one in the Pacific region has requested or received a permit to kill an eagle. Tr. 378, 391. Only one depredating eagle permit has been granted in Oregon and the FWS required relocation of the eagle. *Id.* at 378. It is inconceivable that the FWS would have granted Jim a permit to kill 12 eagles per year had he so requested. Because the law prohibits Jim from killing eagles, I conclude that it substantially burdens his religious belief that he can kill 12 eagles per year.

Even if Jim did not need to kill eagles to practice his religion, it is clear that the repository system could not adequately meet his needs.

First, eagles are not immediately available from the repository. In Portland, it takes an average of 33.4 days for the government to process the application and send the request to the repository. On average, it takes the repository two weeks to supply most feathers; six months to one year for parts; and 18 months for carcasses. Kniffen Affidavit at par. 7–9.

Jim's past experience with the repository confirms that long waits are not unusual. On November 30, 1978, Jim requested a golden wing and tail. After a fifteen-month wait, he received two bald tails, two claws and two wings. On July 24, 1981, Jim requested bald wings, tails and claws. After a fourteen-month wait, he received the parts. On December 10, 1987, Jim made a verbal request for 50 golden feathers. After three months, they were received. On March 6, 1989, Jim requested one golden eagle, two tails and one set of wings. This request was suspended by FWS when Jim was arrested for killing eagles in 1990.

The director of the Ashland eagle repository testified that on an emergency basis "such as an imminent death, a burial, a marriage, etc." the repository will expedite a pending request if the feathers are available. Affidavit of James Kniffen, par. 10. This "practice" has been in effect since 1977. *Id.*

It would have taken Jim approximately six weeks to obtain feathers for a burial from the repository. The informal process for emergency burial feather requests is not publicized, nor is it provided for by law. Furthermore, in Jim's circumstance, there is no evidence that the burials were imminent, as would have been required for an emergency request.

Second, the permit system allows only one permit (for one eagle or its equivalent in parts) to be pending. Therefore, during a one-year period, Jim could not receive 12 eagles. In all likelihood, he would receive only one eagle every 18 months.

I conclude, therefore, that the law substantially burdens Jim's exercise of religion because it prevents him from killing 12 eagles per year and the repository system does not adequately alleviate that burden.

### 4. *Compelling Government Interest*

In determining whether the government has a compelling interest in the BGEPA and the ESA, "it is useful to look first at the importance of the value underlying the regu-

lation, and second, at the degree of proximity and necessity that the chosen regulation bears to the underlying value." *Callahan,* 736 F.2d at 1274.

### A. *BGEPA*

The government argues that Congress sought to protect the golden eagle because: 1) doing so would also protect the bald eagle (young bald eagles are nearly indistinguishable from golden eagles); 2) golden eagles are important to Indian religious practices and agriculture (rodent control); and 3) to protect their numbers from extinction. *See United States v. Dion,* 476 U.S. 734, 741–43, 106 S.Ct. 2216, 2221–22, 90 L.Ed.2d 767 (1986) (noting legislative purposes of BGEPA with respect to golden eagles).

The government relies on *Thirty–Eight Golden Eagles* where the court held that the BGEPA was supported by a compelling state interest. *Thirty–Eight Golden Eagles,* 649 F.Supp. at 276–77. However, in *Thirty–Eight Golden Eagles,* the issue was not contested.

Jim relies on *United States v. Abeyta,* 632 F.Supp. 1301 (D.N.M.1986), where the court held that the government did not have a compelling interest in protecting golden eagles under the BGEPA. *Id.* at 1307. The court based its holding on undisputed evidence that the golden eagle is not endangered, some golden eagles could be killed without an adverse effect on their populations, and that the New Mexico golden eagle population was not in decline. *Id.* at 1307, 1304.

The evidence provided by the government distinguishes *Abeyta.* While it is agreed that the golden eagle is not threatened, its numbers are in decline. It is estimated that there are 500 pairs of golden eagles in Oregon (approximately ⅓ of its "historic level"). Affidavit of Ralph Opp, par. 10; *see also* Affidavit of Karen Steenhof (describing declines in population in Idaho and other parts of the country since 1971).

Ralph Opp, a biologist for the Oregon Department of Fish and Wildlife, opines that the golden eagle in Oregon could not "withstand significant hunting pressure without the possibility of going into serious decline."

*Id.* at par. 11A. Golden eagles, like bald eagles, have low reproductive rates and mate for life.

There is also evidence that golden eagles should not be hunted because it is very difficult for a hunter to distinguish between a golden eagle and a bald eagle under three years of age, which lack the white head and tail. Therefore, hunting of golden eagles would lead to additional, accidental killing of bald eagles. Opp Affidavit at 11B.

With this uncontradicted evidence, the government has met its burden of proving that the BGEPA is promoting a compelling interest in protecting the declining numbers of golden eagles.

### B. *ESA*

The Supreme Court has noted that "the language, history, and structure of the [ESA] ... indicates beyond doubt that Congress intended endangered species to be afforded the highest of priorities." *Tennessee Valley Authority v. Hill,* 437 U.S. 153, 174, 98 S.Ct. 2279, 2292, 57 L.Ed.2d 117 (1978).

Bald eagles are threatened in Oregon and endangered in most other states. This year, the federal government proposed upgrading the bald eagle's status to threatened in most states. However, there is no proposal for delisting the bald eagle.

Under the ESA, recovery plans for the bald eagle have been established. In the Pacific Northwest, some of the recovery goals for the bald eagle have been met but not to the extent that bald eagles are eligible for delisting. *See* Steenhof Affidavit at 1–2.

In Oregon, there are about 230–263 nesting pairs of bald eagles. Since 1984, the numbers in Oregon have doubled. Affidavit of Frank Isaacs, 4. While bald eagles are rebounding, biologists believe that hunting would jeopardize the recovery because: eagles have a slow maturity rate (4–5 years to reach breeding age); the death of either parent substantially decreases the likelihood of babies surviving and slows reproduction of the surviving mate (because eagles mate for life); bald eagles produce an average of one baby per year and 70% of the babies die within the first year of life; hunting could cause bald eagles to abandon nesting sites;

and suitable habitat is limited. Steenhof Affidavit at 3–4, Opp Affidavit, 4–8.

That the bald eagle is making a rebound does not mean that the government does not maintain a compelling interest in its protection. There is no proposal to delist the bald eagle anywhere in the country: it remains a threatened species in Oregon.

The government has met its burden of proving that the ESA promotes the compelling interest of protecting the threatened bald eagle and its fragile recovery.

### 5. *Least Restrictive Means*

■ This is the most important element of the test because it "forces us to measure the importance of a regulation by ascertaining the marginal benefit of applying it to all individuals, rather than to all individuals except those holding a conflicting religious conviction." *Callahan*, 736 F.2d at 1272. "If the compelling state goal can be accomplished despite the exemption of a particular individual, then a regulation which denies an exemption is not the least restrictive means of furthering the state interest." *Id.* at 1273.

The question is whether "the government has a compelling state interest in not exempting a religious individual from a particular regulation." *Id.* Thus, the issue is whether the government has a compelling state interest in preventing Jim from killing 12 eagles per year, as needed for his religious exercise. This includes consideration of whether persons other than Jim hold his religious belief and the effect thereof. *Id.* at 1274 (noting absence of such evidence); *see also Thomas*, 450 U.S. at 719, 101 S.Ct. at 1432 (same).

The government argues that, by allowing Indians access to eagles through the permit process, the government has employed the least restrictive means for achieving its compelling interest in protecting the golden and bald eagles and that exempting Jim from the permit process would result in a devastating loss of eagles nationally. *See Thirty–Eight Golden Eagles*, 649 F.Supp. at 277 (finding that the cost of exempting all Indians from the BGEPA would be "disastrous to the ea-

gles, in that their numbers could be severely reduced").

Jim argues that *Abeyta* supports his claim that the law is not the least restrictive means of furthering the government's interest. In *Abeyta*, the court found that even if the BGEPA advanced a compelling interest, it was not the least restrictive means. *Abeyta*, 632 F.Supp. at 1307. It found that the repository system was "utterly offensive and ultimately ineffectual" because it was cumbersome, overly intrusive and insensitive. *Id.*

*Abeyta* is factually distinguishable, however, because in that case there was evidence that the government had issued permits to ranchers to kill depredating golden eagles. *Id.* There was also uncontradicted evidence that some eagles could be killed without adversely affecting the population. *Id.* In addition, *Abeyta* does not consider the extent to which exemptions would interfere with the government's compelling interests. For these reasons, its holding is unpersuasive in this case.

Jim argues that the government should streamline the permit process and salvage more eagles for distribution to Indians.

The permit system involves delays that are, at times, substantial. However, this shortcoming stems largely from the high demand and limited supply of eagles.

The government takes steps to salvage eagle carcasses. While the government did not have a formal retrieval system until 1994, FWS agents maintained contacts with other federal and state agents to retrieve dead birds for religious use. Tr. 243–45. The repository director has sought and obtained advice from Indians to determine when carcasses are unusable for religious purposes. *Id.* at 342. He rejects few eagles and distributes as much of the eagle carcasses as possible. *Id.* at 342–43.

While the permit system is not perfect, the changes suggested by Jim would not alleviate the burden the law places upon him. Allowing Jim, and those who share his beliefs, to kill eagles is the only method of increasing supply that would adequately meet his needs.

If Jim were allowed to kill 12 bald eagles per year, the loss of eagles would equal 37.5% of the 1992–93 increase in the number of nesting bald eagles in Oregon. Reports show decreasing golden eagle populations. Tr. 274. No biologist testifying at the hearing, including the defense biologist, could recommend that even a limited hunt of eagles would be appropriate. Tr. 273–74.

Even if a limited hunt of eagles did not threaten the survival of the eagles, it poses enforcement problems. The FWS relies heavily upon the public to report the illegal killing of eagles. Allowing the limited killing of eagles would cause the public to assume that a killing was lawful and result in few reports of illegal activity. Tr. 394–95 (explaining that the limited lawful gillnet fishing on the Columbia River has led to the perception that all gillnet fishing is legal).

Based on the facts of this case, I conclude that the means employed by the government are the least restrictive capable of accomplishing the compelling interests of preventing the decline of the golden eagle population and protecting the bald eagles' slow recovery. The government has a compelling interest in not exempting Jim and those who share his religious belief of killing eagles.

### CONCLUSION

I conclude that the prosecution of Jim under the BGEPA and the ESA does not violate RFRA.