UNITED STATES of America, Plaintiff,

v.

David William LUNDQUIST, Defendant.

No. CR 95–350–JO.

United States District Court,
D. Oregon.

July 30, 1996.

Kristine Olsen, U.S. Attorney, District of Oregon, Frank Noonan, Assistant U.S. Attorney, Portland, OR, for Plaintiff.

Steven Wax, Federal Public Defender, District of Oregon, Michael Levine, Assistant Federal Public Defender, Portland, OR, for Defendant.

## ORDER

ROBERT E. JONES, District Judge.

Defendant David William Lundquist moves to dismiss the two-count information charging him with violations of the Bald and Golden Eagle Protection Act ("BGEPA"), 16 U.S.C. § 668. Lundquist's position is that under the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb, the BGEPA limitation on possession of eagle parts violates his right to free exercise of religion. Lundquist also asserts that the BGEPA is invalid under the Commerce Clause of the United States Constitution because the activity in question, possession of eagle parts, does not substantially affect interstate commerce. Finally, Lundquist asserts that the criminalization of possession of bird parts is a violation of his privacy rights.

## PROCEDURAL BACKGROUND

Lundquist has been charged with two counts of possession of protected bird feathers and parts, in violation of 16 U.S.C. § 668(a). The feathers and parts were found by law enforcement agents on August 26, 1992, while the agents were executing a search warrant that called for seizure of evidence relating to other crimes of which defendant was suspected. The two count information supersedes an original eleven-count information that the government dismissed.

## FACTUAL BACKGROUND

Lundquist is an American citizen who practices Native American religion as part of what he asserts to be his deeply and sincerely held religious beliefs. He is not an enrolled member of a legally recognized Indian tribe, though he claims Indian descent via his grandfather, who also was not enrolled, but whose parents were part Cherokee and part Lakota Sioux.

In August of 1992, Lundquist was charged with possession of golden and bald eagle parts and feathers in violation of the BGE-PA. Lundquist received a golden eagle head as a gift from an individual in Arizona, and received a feather as a gift from a Native American following participation in an Indian religious rite. Lundquist regards these eagle parts as sacred religious symbols, which are to be preserved and revered. Lundquist testified at a hearing on May 24, 1996, that the use of eagle feathers and parts is necessary in performing the specific religious practices in which he engages as part of his religious belief.

There is no evidence to suggest that Lundquist possessed the bird parts following an illegal taking, or that he was trafficking in the bird parts.

## STATUTORY FRAMEWORK

The BGEPA prohibits, among other things,. taking or possessing bald or golden eagles without a permit. 16 U.S.C. § 668(a) provides, in relevant part, that:

> Whoever, within the United States or any place subject to the jurisdiction thereof, without being permitted to do so as provided in this subchapter, shall knowingly, or with wanton disregard for the consequences of his act take, possess, sell * * * transport, export or import at any time or in any manner, any bald eagle commonly known as the American eagle, or any golden eagle, alive or dead, or any part, nest or egg thereof of the foregoing eagles, or whoever violates any permit or regulation issued pursuant to this subchapter, shall be fined not more than $5,000 or imprisoned not more than one year or both.

A properly enrolled Indian may receive golden or bald eagle carcasses, parts or feathers through a permit system run by the U.S. Fish and Wildlife Service. The permit application requires an Indian to list (1) the species and number of eagles requested; (2) where the eagle will come from; (3) the name of tribe the applicant belongs to; (4) the tribal religious ceremony; (5) certification from the Bureau of Indian Affairs ("BIA") of Indian status; and (6) certification from the applicant's religious group that the applicant is authorized to participate in ceremonies. 50 C.F.R. § 22.22.

Indian status is accorded only those who meet the specific requirements for enrollment and whose names appear on a particular roll of Indians, which is approved by the Secretary of the Interior. The qualifications and the deadline for filing application forms for enrollment are laid out in 25 C.F.R. § 61.4.

RFRA was enacted by Congress in 1993 in response to the Supreme Court decision in *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), which held that where a statute substantially burdened a person's exercise of religion, the statute nonetheless would be found constitutional if it was both neutral and generally applicable. *Smith*, 494 U.S. at 882–83, 110 S.Ct. at 1602. Congress' intent was to restore the law to accord with pre-*Smith* jurisprudence so that:

> Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—
>
> (1) is in furtherance of a compelling governmental interest; and
>
> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000bb–1(b).

## DISCUSSION

### A. Free Exercise of Religion Claim

█ Lundquist contends that in light of the protection afforded his religious practices under RFRA, the BGEPA's prohibition of

possession of eagle parts is an unconstitutional violation of his First Amendment right to free expression of religion.

The determination of whether the BGEPA violates Lundquist's rights under RFRA requires a three-part analysis. *Callahan v. Woods,* 736 F.2d 1269, 1273 (9th Cir.1984), *citing Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), and *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). First, Lundquist must show that the regulation of eagle feathers substantially interferes with his free exercise of religious beliefs. The government must then show that the regulation serves a compelling government interest. Third, and finally, the government must show that the government objectives cannot be advanced through use of a regulation that is less intrusive of Lundquist's religious practices, and that refusing his exemption is, therefore, the least restrictive means of preserving eagle populations.

### 1. Burden on Lundquist's Free Exercise of Religion

The government argues that Lundquist does not have standing because Lundquist's religious practices have not been defined sufficiently for the court to determine whether his religious practices have been substantially burdened. Specifically, the government contends that Lundquist has not presented credible evidence of his sincerely held religious beliefs; that he has not identified the specific religious practices in which he utilizes eagle feathers and parts; and that he has not alleged that BGEPA has substantially burdened his religious practices.

■ Lundquist clearly demonstrated at his hearing the sincerity of his religious beliefs, *see Jolly v. Coughlin,* 76 F.3d 468, 476 (2nd Cir.1996), *citing Patrick v. LeFevre,* 745 F.2d 153 (2nd Cir.1984), and described the role of eagle parts both in his faith and in his religious practices. It is not necessary that Lundquist show that his religious practices are shared by others. *See Thomas v. Review Bd. of Indiana Empl. Sec. Div.,* 450 U.S. 707,

715–16, 101 S.Ct. 1425, 1430–31, 67 L.Ed.2d 624 (1981).

Lundquist must show, however, that the burdened religious practices are central to his religious beliefs, and that his inability to practice them is more than an inconvenience to his right to free exercise. In other words, his inability to engage in the religious practice must amount to a substantial burden and an "interference with a tenet or belief that is central to religious doctrine." *Bryant v. Gomez,* 46 F.3d 948, 949 (9th Cir.1990), *citing Graham v. C.I.R.,* 822 F.2d 844, 850–51 (9th Cir.1987).

Other courts have concluded that the status of the eagle feather in Indian religion is similar to that of the cross in the Christian faith, and the government has not persuaded me to disagree with that conclusion. *See United States v. Thirty–Eight Golden Eagles or Eagle Parts,* 649 F.Supp. 269, 276, *aff'd,* 829 F.2d 41 (9th Cir.1987). Having accepted the sincerity of Lundquist's adherence to Native American religious beliefs, I conclude that eagle parts occupy a central position in the practice of Lundquist's religion.[1]

Lundquist's particular use of the feather during his prayer as part of a "sacred medicine bundle" or as a talisman during his vision quests, supports this conclusion, and it is not necessary, therefore, to rely on the broad statement that "any scheme which limits the access of the faithful to their talisman must be seen as having a profound effect on the exercise of religious belief." *Thirty–Eight Golden Eagles,* 649 F.Supp. at 276. The District of Oregon has rejected that broad test as dicta, and requires instead that "the particular facts of [each] case must be examined in the light of the BGEPA." *United States v. Jim,* 888 F.Supp. 1058, 1062 (D.Or.1995). The particular facts of this case convincingly show that Lundquist's inability to possess eagle parts under the BGEPA creates more than a mere inconvenience to his right of free exercise, but constitutes a substantial burden.

---

**1.** The record is silent concerning Lundquist's use of the golden eagle head, but I assume for purposes of this decision that the head, like the feathers, occupy a central position in his religious practices.

### 2. Compelling Government Interest in Protecting Eagles

Lundquist contends that the government cannot establish a compelling interest that outweighs his constitutional right to free exercise of religion.

The proper test in this case is whether there is "a compelling state interest which justifies the burden imposed upon the religious belief." *Thirty–Eight Golden Eagles,* 649 F.Supp. at 275. In determining whether the government has a compelling interest in protecting eagles under the BGEPA, "it is useful to look first at the importance of the value underlying the regulation, and second, at the degree of proximity and necessity that the chosen regulation bears to the underlying value." *Callahan,* 736 F.2d at 1274.

The first of the *Callahan* considerations, the value underlying the regulation, weighs heavily in favor of the government. Lundquist concedes that "the government clearly has a compelling interest in maintaining the viability of eagles as a species." (Defendant's Memorandum, p. 3). The court notes that the state's compelling interest extends to golden and bald eagles alike. In *Thirty–Eight Golden Eagles,* district court held that the interest underlying the BGEPA is "of great importance, in that both the bald and golden eagle are species whose existence is threatened." *Thirty–Eight Golden Eagles,* 649 F.Supp. at 276. In *Jim,* 888 F.Supp. at 1063, the court found that:

> Bald eagles are threatened in Oregon and endangered in most other states. * * * While bald eagles are rebounding, biologists believe that hunting would jeopardize the recovery because: eagles have a slow maturity rate (4–5 years to reach breeding age); the death of either parent substantially decreases the likelihood of babies surviving and slows reproduction of the surviving mate (because eagles mate for life); bald eagles produce an average of one baby per year and 70% of the babies die within the first year of life; hunting could cause bald eagles to abandon nesting sites; and suitable habitat is limited.

* * * That the bald eagle is making a rebound does not mean that the government does not maintain a compelling interest in its protection. There is no proposal to delist the bald eagle anywhere in the country: it remains a threatened species in Oregon. (Citations omitted.)

The *Jim* court also found that golden eagles, like bald eagles, are in decline, have low reproduction rates, and mate for life. In addition, the court noted that it is difficult for a hunter to distinguish between golden and bald eagles under three years of age. *Jim,* 888 F.Supp. at 1063.

In summary, Lundquist does not contend that the need to protect eagles is not compelling, and I conclude, as have other courts, that the government's interest in protecting eagles remains valid.

Although he concedes that the government has a valid interest in protecting eagles, Lundquist contends that the government has not satisfied the second element required for a showing of compelling interest under *Callahan,* that there be a strong nexus between the regulation and the underlying government interest. Lundquist attempts to distinguish cases which have rejected religious freedom defenses, arguing that those cases rely on the government's compelling interest in preventing the killing of eagles, not in preventing the possession of their feathers. *See, e.g., Jim,* 888 F.Supp. 1058.

Lundquist contends that the regulations prohibiting the possession of eagle parts are not sufficiently related to the underlying government interest of preserving eagles. His distinction between possession of eagle parts and killing eagles, however, finds no support in analogous law on protection of other species,[2] or in case law. The *Thirty–Eight Golden Eagles* court stated in dicta, which nonetheless is on point here, that "the regulations contained in the United States Code and the Code of Federal Regulations are clearly proximately and necessarily related to the protection of these threatened species, as they purport to prevent the unnecessary de-

---

2. *See, e.g.,* 16 U.S.C. § 1538(a)(1)(D) (Endangered Species Act); 16 U.S.C. § 1372(a)(3) (Marine Mammal Protection Act); 16 U.S.C. § 1857(1)(G) (Magnuson Fishery Conservation and Management Act); 16 U.S.C. § 703 (Migratory Bird Treaty Act).

struction of these rare birds." *Thirty–Eight Golden Eagles,* 649 F.Supp. at 276–77, *citing* Senate Rep. No. 1159, 92nd Cong., 2nd Sess. (1972). Furthermore, the Supreme Court has found that:

> [A] large number of the birds are killed to obtain these feathers, as well as to provide souvenirs for tourists in the Indian country. In addition, they are actively hunted by bounty hunters in Texas and some other States. As a result of these activities * * * there is a grave danger that the golden eagle will completely disappear. *United States v. Dion,* 476 U.S. 734, 742, 106 S.Ct. 2216, 2222, 90 L.Ed.2d 767 (1986).

It is clear to this court that the underlying objective of the BGEPA is to prevent the illegal killing of eagles by discouraging an excessive demand for their parts, and that the compelling interest can be furthered only by criminalization of the possession of eagle parts.[3]

#### 3. *Least Restrictive Means of Furthering Government Interest*

■ Lundquist contends that the government cannot show that the prohibition on his possession of eagle feathers is the least restrictive means of preserving eagles. He contends that amending the permit process to allow exemptions for non-enrolled Indians such as himself, or subjecting him to a civil rather than a criminal penalty, would be less invasive of his religious practices, and therefore a "less restrictive means."[4]

■ The test for the least restrictive means inquiry was formulated by the Ninth Circuit in *Callahan:*

If the compelling state goal can be accomplished despite the exemption of a particular individual, then a regulation which denies an exemption is not the least restrictive means of furthering the state interest. A synthesis of the two prongs is therefore the question whether the government has a compelling interest in not exempting a religious individual from a particular regulation. *Callahan,* 736 F.2d at 1272–73.

Lundquist correctly points out that this court must apply the test as enunciated in *Callahan.* Lundquist also cites to the Ninth Circuit holdings in *United States v. Bauer,* 75 F.3d 1366 (9th Cir.1996), and in *Cheema v. Thompson,* 67 F.3d 883 (9th Cir.1995), which reaffirmed RFRA's restoration of the "compelling interest" test in cases where free exercise of religion is substantially burdened. *See also Bryant v. Gomez,* 46 F.3d 948, 949 (9th Cir.1994), *quoting* 42 U.S.C. § 2000bb–1(b).

In *Callahan,* the court held that the exemption of one person from the requirement that each person have a social security number ("SSN") could not be found to be incompatible with the operation of Aid to Families with Dependant Children ("AFDC") without first considering evidence of the actual impact and cost of the exemption. In *Callahan,* there was no evidence that a single exemption might mandate the development of an alternative administrative system, nor was there evidence that other people might hold Callahan's religious beliefs and so require further accommodation. *Callahan,* 736 F.2d at 1274. Without a showing that exempting Callahan from the SSN requirement would undermine the government's compelling interest in operating AFDC, the court

---

**3.** Lundquist himself emphasizes that his argument does not depend on the government interest ceasing when the illegal killer of an eagle transfers its possession to another party, thereby suggesting that such an interest persists.

**4.** Lundquist has no standing to challenge the alleged imperfections of the permit process because he has never applied for a permit. *See Thirty–Eight Golden Eagles,* 649 F.Supp. at 277, in which the court commented that:

> Although the claimant argues that this permit procedure also is violative of the free exercise

clause, one must remember that the claimant has no standing to challenge the alleged imperfections of the permit process, in that he has never applied for such a permit. In this proceeding, the claimant only has standing to challenge the facial validity of the Eagle Protection Act, and this Court finds that the Act meets the requirements set forth in Callahan. Nor does the fact that Lundquist did not apply for a permit because he is not an enrolled Indian give him standing where standing would not otherwise exist.

could not properly find that the SSN requirement was the least restrictive means of achieving the government interest. *Callahan,* 736 F.2d at 1275; *see also Cheema,* 67 F.3d at 885 ("The problem was a total failure of proof; the school district refused to produce any evidence whatever to demonstrate the lack of a less restrictive alternative").

In this case, the government has provided ample evidence that exempting Lundquist from the prohibition on possession of eagle parts would seriously undermine the two government interests at stake: the interest in preserving eagles and the interest in preserving Native American religion among those who have shown proper grounds for exemption from the BGEPA.

As discussed above, the government's interest in protecting bald eagle populations is compelling and would be seriously undermined by a broad exemption from the prohibitions set forth in the BGEPA. The government's interest in preserving Native American religion, the limited supply of eagle feathers and parts, and the high demand by eligible Native Americans, which has already caused long waits and a burden on the free exercise of religion, are well documented by the courts. *See, e.g., Jim,* 888 F.Supp. at 1062. This, combined with the fact that the practice of Native American religion is not restricted to a very few individuals as was the situation in *Callahan,* leads this court to conclude, as did the court in *Thirty–Eight Golden Eagles,* that:

> In *Callahan,* the cost of exempting one individual from the numbering system had not been shown by the government, and actually appeared, in common sense, to be fairly slight. In this case, however, the cost of exempting all Indians from the regulatory procedures would be disastrous to the eagles, in that their numbers could be severely reduced. *Thirty–Eight Golden Eagles,* 649 F.Supp. at 277, *citing* H.R.Rep. No. 1450 87th Cong., 2nd Sess. (1962).

In this case, the exemption proposed by Lundquist potentially is much broader than that even in *Thirty–Eight Golden Eagles.*[5] Allowing the possession of bald and golden eagle parts by non-Native Americans would seriously undermine the Congressional objective in the BGEPA.

This leads me to conclude that the BGEPA employs the least restrictive means of promoting the dual government interests of (1) preserving eagles and (2) preserving access to eagle parts by those Indians who meet the criteria for and have acquired the appropriate permit, and strikes the proper balance between the two. *See Rupert v. Director, United States Fish and Wildlife Service,* 957 F.2d 32, 36 (1st Cir.1992) ("indeed, given the nature of the governmental interests at stake and the close fit between the exemption and those interests, we would be hard put to say that the exemption could not survive even 'strict scrutiny' ").

In summary, I conclude that the means employed by the government are the least restrictive means available for preserving and protecting eagle populations, and that the BGEPA, therefore, does not violate RFRA.

## B. *Right to Privacy Claim*

 Lundquist contends that the BGEPA violates his right to privacy in that it prohibits possession of eagle parts in the privacy of his home and thereby restricts his expression of religion. Lundquist, however, fails to cite any authority supporting such a privacy right in his religious exercise and so fails to distinguish this claim from his broader facial attack on the constitutionality of the BGEPA.

The Supreme Court has been cautious in extending right to privacy jurisprudence to new interests. *See, e.g., Griswold v. State of Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (right of access to birth control); *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) (right to abortion); *Carey v. Population Services Int'l,* 431

---

5. Lundquist speculates that "the number of persons, like Mr. Lundquist, who are adherents of Native American religion and have some Indian blood cannot be great." (Defendant's Reply Memorandum, p. 7). This speculation is not

convincing evidence that the conservation interests of the government would not be seriously undermined by exempting defendant (and all others with similar claims) from the permit requirement.

U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977) (right to contraception). More recently, the Court has expressly refused to find that its earlier decisions "endorsed an all-encompassing 'right to privacy' as *Roe* claimed." *Planned Parenthood v. Casey*, 505 U.S. 833, 839, 112 S.Ct. 2791, 2801, 120 L.Ed.2d 674 (1992) (citations omitted).

Even if I were to find a privacy right of the sort that Lundquist proposes, the cases he cites do not support his claim that such a privacy right would be violated by the BGEPA.

In *Stanley v. Georgia*, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969), the Supreme Court struck down a child pornography statute on privacy grounds, but it did so because of the "weak interests asserted by the State in that case," *i.e.*, discouraging antisocial conduct. *Osborne v. Ohio*, 495 U.S. 103, 110, 110 S.Ct. 1691, 1696, 109 L.Ed.2d 98 (1990). Where the government's interest is more compelling, as in this case, the Supreme Court has held that possession of contraband material is not protected by the First Amendment right to privacy. Even in *Stanley*, the court emphasized that statutes may criminalize possession of certain materials when "compelling reasons * * * exist for overriding the right of the individual to possess those materials." *Stanley*, 394 U.S. at 568, n. 11, 89 S.Ct. at 1250, n. 11. In *Osborne*, the Supreme Court found such an interest where the statute in question was intended to "destroy a market for the exploitive use of children." *Osborne*, 495 U.S. at 109, 110 S.Ct. at 1696. The Court held that penalizing the possession of pornography would decrease the demand for it, which in turn would decrease production and thus advance the state's compelling interest. *Osborne*, 495 U.S. at 109–10, 110 S.Ct. at 1696.

In the present case, BGEPA is intended to advance the government's compelling interest, discussed above, by penalizing the possession of eagle parts, in turn destroying the market for such parts and reducing the illegal taking of eagles. Even assuming the privacy right Lundquist proposes exists hypothetically, I find that the government's interest overrides that hypothetical right.

## C. *Congressional Power Under the Commerce Clause*

█ As a final argument, Lundquist contends that the possession of eagle parts is not an activity that falls under congressional authority to regulate because the activities at issue do not substantially affect interstate commerce. *See U.S. v. Lopez*, —— U.S. ——, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995).

In *Lopez*, the Court confirmed the three broad categories of activity that Congress may regulate under its commerce power:

1. Congress may regulate the use of the channels of interstate commerce.

2. Congress may regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may only come from intrastate activities.

3. Congress may regulate activities that have a substantial relation to interstate commerce.

*See Lopez*, —— U.S. at ——, 115 S.Ct. at 1629–30.

The government argues, and I agree, that Congress may regulate the possession of eagle parts through the BGEPA under any one of these three categories of commerce power. Because Lundquist contends only that the BGEPA does not substantially affect interstate commerce, I will address only that argument.

As the government points out, the prohibition on the unpermitted possession of eagle feathers and parts is targeted at reducing the illegal trafficking of eagles. The BGEPA prohibits a class of activities, *e.g.*, sale, purchase, or possession, and is aimed at controlling the interstate market for eagle feathers and parts by creating criminal liability for those who create the demand for them. *See Dion, supra*, 476 U.S. at 742, 106 S.Ct. at 2222 (one of Congress' concerns in enacting the BGEPA was that many eagles were being killed "to provide souvenirs for tourists" (citation omitted)). By regulating the market for eagle parts, the BGEPA controls a form of economic activity for which the federal government has ultimate responsibility.

Lundquist's argument that the effect on commerce is not substantial lacks merit. In *Lopez*, the Supreme Court held that the regulation of firearm possession in a local school zone did not have a substantial effect on interstate commerce because such possession was "not an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." *Lopez*, —— U.S. at ——, 115 S.Ct. at 1631. In contrast, in the present case the possession of eagle parts is an activity which affects a broad regulatory scheme relating to commercial transactions and which, when viewed in the aggregate with similar activities nationwide, substantially affects interstate commerce. *See Lopez*, —— U.S. at ——, 115 S.Ct. at 1631.

## CONCLUSION

Based on the above, the defendant's motion to dismiss is DENIED.