**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Leonard Fridall Terry ANTOINE,
Defendant–Appellant.**

**No. 02–30008.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 4, 2002.

Filed Jan. 31, 2003.

Michael Filipovic, First Assistant Federal Public Defender, Seattle, WA, argued for the appellant. Vicki W.W. Lai joined him on the brief.

Helen J. Brunner, Assistant United States Attorney, Seattle, WA, argued for the appellee. John McKay joined her on the brief.

Before REAVLEY,* KOZINSKI and W. FLETCHER, Circuit Judges.

## OPINION

KOZINSKI, Circuit Judge.

This case once again pits the federal government's efforts to save the bald eagle from extinction against the bird's profound significance to Native spirituality. Appel-

---

lant Leonard Fridall Terry Antoine, a member of a Canadian Indian tribe, is spending two years in prison for violating the Bald and Golden Eagle Protection Act (BGEPA), 16 U.S.C. §§ 668–668d. We must decide whether his conviction violates the Religious Freedom Restoration Act (RFRA), 42 U.S.C. §§ 2000bb to 2000bb–4.

**1.** Antoine is a member of the Cowichan Band of the Salish Indian Tribe in British Columbia. He obtained dead eagles in Canada and brought feathers and other eagle parts into the United States, where he swapped them for money and goods. Antoine claims that these exchanges are part of the native custom of "potlatch," which to him has religious significance. United States authorities charged him with violating BGEPA, which makes it illegal to "knowingly ... take, possess, sell, purchase, barter, offer to sell, purchase or barter, transport, export or import, at any time or in any manner, any bald eagle" or part thereof. 16 U.S.C. § 668(a).

Notwithstanding this prohibition, members of federally recognized Indian tribes can apply for permits to possess and transport eagles or eagle parts for religious purposes. *See id.* § 668a; 50 C.F.R. § 22.22. Federal wildlife agents who find eagle carcasses send them to a repository in Colorado, which fills applications on a first-come, first-served basis. Because demand significantly exceeds supply, the waiting list is several years long. Antoine is not eligible for a religious use permit at all, however, because his band is not recognized by the United States.

Antoine moved to dismiss the prosecution, arguing that he was exempt from BGEPA under RFRA, which suspends generally applicable federal laws that "substantially burden a person's exercise of religion" unless the laws are "the least restrictive means of furthering [a] compelling governmental interest." 42 U.S.C.

---

* The Honorable Thomas M. Reavley, Senior United States Circuit Judge for the Fifth Circuit, sitting by designation.

§ 2000bb–1(a)–(b); *Guam v. Guerrero*, 290 F.3d 1210, 1220–21 (9th Cir.2002).[1] The district court assumed that all of Antoine's activities held religious significance to him, and found that BGEPA imposed a substantial burden.[2] It nonetheless refused to dismiss the charges, holding that BGEPA survives strict scrutiny under RFRA. Antoine was convicted and now appeals.

2. We confronted the intersection of RFRA and BGEPA on one prior occasion: *United States v. Hugs*, 109 F.3d 1375 (9th Cir.1997) (per curiam). In *Hugs*, we rejected a RFRA challenge brought by members of a recognized Indian tribe. *Id.* at 1378–79.[3] We found that the government's interest in "protecting eagles as a threatened or endangered species" was compelling. *Id.* at 1378. We further determined that the permit scheme was the least restrictive means of pursuing that interest because it still "permitt[ed] access to eagles and eagle parts for religious purposes," albeit not in as convenient a manner as the defendants would have liked. *Id.* at 1378–79; *accord United States v. Oliver*, 255 F.3d 588 (8th Cir.2001) (per curiam); *United States v. Jim*, 888 F.Supp. 1058 (D.Or.1995); *cf. United States v. Top Sky*, 547 F.2d 486 (9th Cir. 1976) (per curiam) (rejecting a similar challenge under the Free Exercise Clause); *United States v. Thirty Eight (38) Golden Eagles or Eagle Parts*, 649 F.Supp. 269 (D.Nev.1986) (same). *But see United States v. Abeyta*, 632 F.Supp. 1301, 1307 (D.N.M.1986) (criticizing the reposito-

ry program as "utterly offensive and ultimately ineffectual").

Antoine distinguishes *Hugs* on two grounds. He first notes that two years after *Hugs* was decided, the Fish and Wildlife Service proposed removing the bald eagle from the threatened species list because "available data indicate[d] that this species ha[d] recovered." Proposed Rule To Remove the Bald Eagle in the Lower 48 States from the List of Endangered and Threatened Wildlife, 64 Fed. Reg. 36,454, 36,454 (proposed July 6, 1999). We find the force of this evidence limited. The proposed rule is just that; the Service has not made a final decision to delist. Agencies issue proposed rules in order to educate themselves about their likely effects. *See* 5 U.S.C. § 553(c). The Service may well revise its analysis in light of the information it receives. Because the delisting proposal is based on incomplete information, it carries less weight than a final rule. *See Oliver*, 255 F.3d at 589.

The delisting proposal concededly provides some support for Antoine's argument that the eagle-protection interest is weaker than when *Hugs* was decided. And changed circumstances may, in theory, transform a compelling interest into a less than compelling one, or render a well-tailored statute misproportioned. Nonetheless, the government cannot reasonably be expected to relitigate the issue with

---

1. We treat Antoine's foreign citizenship and residency as irrelevant to his RFRA standing because the government has not asked us to consider them. RFRA does apply to any "person's" exercise of religion, 42 U.S.C. § 2000bb–1, which arguably suggests coverage of all individuals subject to the government's jurisdiction. *Cf. United States v. Verdugo–Urquidez*, 494 U.S. 259, 265–66, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990).

2. Antoine was accused of dealing in eagle parts, not just using them in traditional Native ceremonies. This fact does not defeat his RFRA claim. Antoine asserts that, to him, potlatch exchange of eagle parts has religious

significance. The government counters that potlatch is a cultural practice rather than a religious one. But what matters is its significance to Antoine, not to others. The district court assumed all of Antoine's beliefs were sincere, and we have no basis for disturbing that assumption.

3. *Hugs* never actually says that the defendants were tribe members, only that they were engaged as hunting guides on a reservation. *See* 109 F.3d at 1377. *Hugs*'s reasoning necessarily assumed, however, that they were eligible for permits and therefore presupposes that they were tribe members. *Compare id.* at 1378–79 *with* n. 4 *infra*.

every increase in the eagle population. *Cf. Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 391, 120 S.Ct. 897, 145 L.Ed.2d 886 (2000) ("The quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty ... of the justifications raised."). Such an approach would plague our circuit law with inconsistency and uncertainty. A party claiming that time has transformed a once-valid application of a statute into an invalid one must adduce evidence sufficient to convince us that a *substantial* change in relevant circumstances has occurred. The proposal to delist does not meet this standard.

■■■ Antoine's second argument presents a more difficult question. Unlike the defendants in *Hugs*, Antoine is ineligible for a permit because he is not a member of a recognized tribe. He argues that his exclusion from the permit scheme violates RFRA and so he cannot be prosecuted for obtaining eagles by other means.[4] We do not read *Hugs* to foreclose this aspect of Antoine's challenge. The question whether the permit regime in general is valid is distinct from the question whether its restriction to recognized tribe members is valid. The latter question was neither presented nor decided in *Hugs*; the defendants there were eligible for permits but chose not to pursue them. *Hugs* defeats arguments that the government must increase the number of eagles available (by allowing people to kill their own, for example), but it doesn't speak to how that limited supply of eagles is allocated.

Circuits have split over the exclusion of nonmember Indians from the permit program. In *Gibson v. Babbitt*, 223 F.3d 1256 (11th Cir.2000) (per curiam), the Eleventh Circuit determined that restricting permits to members of federally recognized tribes was the least restrictive means of pursuing a compelling interest in restoring Indian treaty rights. *Id.* at 1258. The United States's treaties with recognized tribes typically secured the right to hunt on reservations, but BGEPA partially abrogated that right. *United States v. Dion*, 476 U.S. 734, 745, 106 S.Ct. 2216, 90 L.Ed.2d 767 (1986). *Gibson* saw the religious use exemption as a valid way to ameliorate the effects of that abrogation by giving tribe members alternative access to eagles. 223 F.3d at 1258; *cf. United States v. Lundquist*, 932 F.Supp. 1237 (D.Or.1996) (upholding the restriction on different grounds against a similar challenge).

The Tenth Circuit saw things differently in *United States v. Hardman*, 297 F.3d 1116 (10th Cir.2002) (en banc). Although it recognized a compelling interest in "preserving Native American culture and religion" and "fulfilling trust obligations to Native Americans," *id.* at 1129, it held, on a record no less extensive than ours, that the government had failed to prove that exclusion of nonmembers was the least restrictive means to address the interest.[5] In the Tenth Circuit's view, the government had "failed to show that broader eligibility would result in an increased wait substantial enough to endanger Native American cultures." *Id.* at

---

4. Because Antoine is ineligible, he need not apply for a permit in order to challenge the permit scheme. *See Desert Outdoor Adver., Inc. v. City of Moreno Valley*, 103 F.3d 814, 818 (9th Cir.1996); *United States v. Hardman*, 297 F.3d 1116, 1120–21 (10th Cir.2002) (en banc).

5. As in *Hardman*, 297 F.3d at 1132, the government relies on a comparison of the number of recognized tribe members to the (much larger) number of people claiming Indian ancestry, but presents no evidence of the relative proportions of the two groups who would apply for a permit if given the chance.

1133. Moreover, although "[t]he government's interest in preserving eagles might have something to do with the total number of people who are allowed to acquire eagle feathers, ... it quite possibly has little to do with the question here, which is how those permits are distributed." *Id.* at 1135.

We do not believe RFRA requires the government to make the showing the Tenth Circuit demands of it. Although the record contains no data on the number of nonmembers who would seek permits if eligible, the consequences of extending eligibility are predictable from the nature of the repository program. The supply of eagles is fixed because the government distributes every eagle and eagle part that comes into the repository; *Hugs*'s conclusion that the permit program is the least restrictive means of protecting eagles forecloses any challenge to the government's refusal to increase supply beyond that.[6] If the government extended eligibility, every permit issued to a nonmember would be one fewer issued to a member. This is the inescapable result of a demand that exceeds a fixed supply.

RFRA requires least restrictive means to avoid substantial burdens on religion. But, in this case, the burden on religion is inescapable; the only question is whom to burden and how much. Both member and nonmember Indians seek to use eagles for religious purposes. The government must decide whether to distribute eagles narrowly and thus burden nonmembers, or distribute them broadly and exacerbate the extreme delays already faced by members. Religion weighs on both sides of the scale. The precise burdens depend on how many nonmember applicants there would be, but not in any illuminating way: Fewer nonmember applicants means shorter additional delays for each member if the restrictions are removed, but also fewer people burdened if they are left in place.

Our cases enforcing RFRA's least-restrictive-means requirement have involved the pursuit of some secular interest in a manner that burdens religion. *See Mockaitis v. Harcleroad,* 104 F.3d 1522, 1530 (9th Cir.1997) (police investigation), *overruled on other grounds by City of Boerne v. Flores,* 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997); *United States v. Bauer,* 84 F.3d 1549, 1559 (9th Cir.1996) (drug prohibition); *Cheema v. Thompson,* 67 F.3d 883, 885 (9th Cir.1995) (school safety), *overruled on other grounds by City of Boerne,* 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624. Antoine isn't asking the government to pursue its eagle-protection goal without burdening religion at all; he wants it to burden other people's religion more and his religion less.[7] This is not a viable RFRA claim; an alternative can't fairly be called "less restrictive" if it places additional burdens on other believers. *Cf. EEOC v. Townley Eng'g & Mfg. Co.,* 859 F.2d 610, 621 (9th Cir.1988) (rejecting an employer's free exercise challenge to Title VII's religious accommoda-

---

6. Antoine brought his eagle parts into the United States from Canada. He argued below that, by doing so, he actually increased supply and alleviated demand on the repository. Eagles, however, are migratory, 50 C.F.R. § 10.13, so trafficking in Canada necessarily affects the American population. The United States's interest in eagle protection therefore extends across the border.

7. The regulations authorize bald eagle possession permits for scientific and exhibition purposes as well as religious purposes. 50 C.F.R. § 22.21. A nonmember Indian might argue that scientific and exhibition uses are not compelling, or that the inclusion of these secular permits renders the program poorly tailored. But Antoine does not raise these arguments; he focuses exclusively on the disparate treatment of religious users.

tion requirement on the ground that "[b]oth [parties] seek to pursue a religious practice"). A contrary holding would entangle the judiciary in standardless efforts to measure the relative burdens a policy inflicts on other religious adherents. *Cf. Kreisner v. City of San Diego,* 1 F.3d 775, 781 (9th Cir.1993) (noting the absence of "judicially manageable standards" in answering questions like, "is a menorah more intense than a cross?"). This is not what the statute prescribes. If the freeway must be built, RFRA doesn't say which house of worship should be razed.

■ The permit program does not discriminate facially on the basis of religion in any way that harms Antoine. *Cf. Davey v. Locke,* 299 F.3d 748, 752–53 (9th Cir.2002). He was excluded, not because of his faith, but because he was not a member of a recognized Indian tribe.[8] Antoine does not allege that the permit restriction was motivated by bias against his religion or favoritism toward the religion of others. *Cf. Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993). And, there is certainly a rational basis for the membership requirement. *See Rice v. Cayetano,* 528 U.S. 495, 519, 120 S.Ct. 1044, 145 L.Ed.2d 1007 (2000) ("Congress may fulfill its treaty obligations and its responsibili-

ties to the Indian tribes by enacting legislation dedicated to their circumstances and needs.").[9] RFRA does not impose further constraints on the government's allocation decision in this case. The government has a compelling interest in eagle protection that justifies limiting supply to eagles that pass through the repository, even though religious demand exceeds supply as a result. Any allocation of the ensuing religious burdens is least restrictive because reconfiguration would necessarily restrict *someone*'s free exercise.

Antoine's prosecution did not violate RFRA, so the district court properly rejected his claim. He raises several other challenges to his conviction and sentence, which we address in a separately filed memorandum disposition.

**AFFIRMED.**

---

8. The permit program does discriminate facially on the basis of religion within the class of recognized tribe members. *See* 50 C.F.R. § 22.22 (authorizing permits only for "members of [recognized] Indian entities" who are "engaged in *religious* activities" (emphasis added)). A recognized tribe member who wanted eagle feathers for nonreligious purposes might have standing to challenge the program on this basis. But Antoine is excluded by the secular classification in the statute—the restriction to recognized tribe members. As to him, the regulation is neutral with respect to religion. *Cf. Rupert v. Dir., U.S. Fish & Wildlife Serv.,* 957 F.2d 32, 35–36 (1st Cir.1992) (rejecting an Establishment Clause challenge on different grounds).

9. Antoine argues that the government's treaty interest is "plagued with inconsistency" because his tribe was the beneficiary of a treaty allowing free passage and commerce between Canada and the United States. The government, however, need not restore either all treaty rights or none. It could rationally decide to restore the treaty rights of only those tribes with which it currently has relations. Its undoubted power to target benefits to recognized tribes implies the more specific power to select only their treaty rights for restoration.