**Harvey (Fire Bird) GIBSON, Plaintiff,**

**v.**

**Bruce BABBITT, in his official capacity as Secretary of the Interior, and B.D. Ott, in his official capacity as Acting Area Director of the Eastern Area Office of the Bureau of Indian Affairs, Defendants.**

No. 95–8049CIV.

United States District Court, S.D. Florida.

Aug. 27, 1999.

---

Arthur Schofield, Schofield & Gonzalez, P.A., West Palm Beach, FL, David J. Sales, Search, Denney, Scarola, Bernhart & Shipley, West Palm Beach, FL, for plaintiff.

Janice M. Schneider, Paul Boudreaux, Mary Anne Kenworthy, Environmental Division, U.S. Department of Justice, Washington, DC, for defendants.

## MEMORANDUM OPINION & FINAL JUDGMENT

HURLEY, District Judge.

This case, to borrow a phrase, has occasioned "a collision of the heart and the mind,"[1] for the plaintiff is truly deserving but the law does not support his claim. Plaintiff is a 68–year–old Native American who served in the military for over twenty years, at stations throughout the world, and with great distinction, earning numerous commendations including the Bronze Star and two Purple Hearts. He holds sincere religious beliefs in the efficacy of bald and golden eagle feathers for religious worship and, therefore, applied to the U.S. Fish and Wildlife Service for five eagle feathers. His application, however, was denied because he is not a member of a federally recognized Indian tribe. The use of this criterion is troubling because, given the United States's role in the forcible relocation of plaintiff's ancestors, there is a reasonable possibility that the government is responsible for plaintiff's inability to meet the requirement. Nonetheless, after careful study of the controlling case law, the court concludes that the requirement of membership in a federally recognized Indian tribe is a permissible agency policy which does not violate the Religious Freedom Restoration Act. Accordingly, the court must enter judgment for the defense.

This case was tried before the court in a non-jury trial. From the testimony and other evidence presented, the court makes the following:

### FINDINGS OF FACT

1. Plaintiff, Harvey (Fire Bird) Gibson is an American Indian, i.e., he is a lineal descendant of native peoples who inhabited what is now the southeastern United States prior to its discovery and colonization by European settlers.

2. Mr. Gibson espouses sincere religious beliefs in the efficacy, indeed, the necessity, for bald and/or golden eagle parts for religious expression.

3. Mr. Gibson is not a member of a federally-recognized Indian tribe.

4. Sometime in the 1970's, the U.S. Fish and Wildlife Service, an agency within the U.S. Department of the Interior, established the National Eagle and Wildlife Repository in Commerce City, Colorado. The Repository serves as the collection site for dead bald and golden eagle carcasses. Pursuant to regulations promulgated by the Secretary of the Interior ("the Secretary"), eagle parts are provided, upon application, to members of feder-

---

1. Leon Wieseltier, Kaddish 8 (1998).

ally recognized Indian tribes for religious purposes.

5. In February 1999, the waiting period for a complete eagle carcass was three to three and a half years. The average waiting period for loose feathers, which cannot exceed fifteen in number, was approximately six months. The demand for eagle parts always has exceeded the available supply.

5. The U.S. Fish and Wildlife Service denied plaintiff's application for five bald or golden eagle feathers because he is not a member of a federally recognized Indian tribe.

Based on the foregoing, the court reaches the following:

### CONCLUSIONS OF LAW

A brief review of the controlling statute, and its amendment in 1962, is essential to understanding the present dispute. In 1940, Congress, concerned that the bald eagle was threatened with extinction, enacted the Bald Eagle Protection Act (the "Act," or "BGEPA" as it is known today) 16 U.S.C. § 668. The act makes it illegal, among other things, to possess live or dead bald eagles. Congress amended the act in 1962 to extend its protection to golden eagles. At the same time, recognizing that Native Americans utilize bald and golden eagle parts for religious purposes, Congress provided an exemption, now codified at 16 U.S.C. § 668(a), to allow the Secretary of the Interior to permit "the taking, possession, and transportation of [bald and golden eagle parts] ... for the religious purposes of Indian tribes." Pursuant to this authorization, the Secretary promulgated regulations, codified at 50 C.F.R. § 22.22, permitting the U.S. Fish and Wildlife Service to collect bald and golden eagle carcasses and, upon application, distribute feathers and other body parts to individuals who are members of a federally recognized Indian tribe and who intend to use the eagle parts for religious purposes.

Plaintiff, an American Indian, is not a member of a federally recognized Indian tribe. He contests the members hip-in-a-

federally-recognized-Indian-tribe requirement on the grounds that it is unnecessarily restrictive and places an impermissible burden on his free exercise of religion. The Secretary responds that the requirement was imposed by Congress, not the Department of the Interior. He asserts that the term "Indian tribe"—admittedly not defined in BGEPA—is a term of art which Congress has used on innumerable occasions and defined repeatedly to mean federally recognized tribes. *See, e.g.,* Indian Child Welfare Act of 1978 § 4, 25 U.S.C. § 1903(8); Indian Self–Determination and Education Assistance Act § 4, 25 U.S.C. § 450b(b). The Secretary's point is well taken, but the same statutes indicate that Congress normally defines terms that are meant to be restrictive. Furthermore, a review of relevant statutes confirms that Congress is very aware of its trust obligation to Native Americans and, in fulfillment of this obligation, often confers benefits on Indians irrespective of their membership in a federally recognized tribe. For example, the Indian Health Care Improvement Act 4, 25 U.S.C. § 1603(c), provides that for three specified health programs an "Indian"

> "shall mean any individual who (1), irrespective of whether he or she lives on or near a reservation, is a member of a tribe, band, or other organized group of Indians, including those tribes, bands, or groups terminated since 1940 [i.e., no longer federally recognized] and those recognized now or in the future by the State in which they reside, or who is a descendant, in the first or second degree, of any such member, ... or (3) is considered by the Secretary of the Interior to be an Indian for any purpose, or (4) is determined to be an Indian under regulations promulgated by the Secretary."

Similarly, section 19 of the Indian Reorganization Act of 1934 defines "Indian" to include "all persons of Indian descent who are members of any recognized Indian tribe now under Federal jurisdiction ... and shall further include all other persons

of one-half or more Indian blood." 25 U.S.C. § 479. Individuals meeting this broad definition are eligible for loans for the payment of tuition and other expenses in recognized vocational and trade schools, 25 U.S.C. § 471, and are entitled to certain employment preferences, 25 U.S.C. § 472(a). Against this backdrop, the court is hesitant to conclude that BGEPA's failure to define "Indian tribe" signals a clear and unambiguous intent on the part of Congress to employ a restrictive criterion for access to religious artifacts. This is especially so when one considers the solicitude Congress has shown for the protection of Native American religions. *See, e.g.,* The Indian Religious Freedom Act, 42 U.S.C. § 1996.

■ As an alternative, the Secretary argues that the department's policy of requiring applicants to be members of a federally recognized Indian tribe is entitled to deference under the doctrine announced in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). There, the Supreme Court held that if Congress did not express its intent clearly, a court must defer to an agency's interpretation if it "is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. at 2782. This would seem to end the debate but for two important principles. First, at least where constitutionally protected activity is implicated, a court should not simply defer to an administrative agency's unexplained or unsupported judgment. *See United States v. Doe,* 968 F.2d 86, 90 (D.C.Cir.1992). Second, and more compelling, the Secretary, like all citizens, is subject to the law; he must exercise his administrative discretion consistent with prevailing law.

■ In this instance, the relevant law is the Religious Freedom Restoration Act, ("RFRA"), 42 U.S.C. § 2000bb et seq. Although the Supreme Court held this act to be unconstitutional as applied to the states, finding that Congress exceeded its enforcement powers under § 5 of the Fourteenth Amendment, the Court did not address RFRA's continued viability as applied to the federal government. *See City of Boerne v. Flores,* 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997). Inasmuch as the parties in this case have not contested the constitutionality or applicability of RFRA to the present dispute, the court assumes without deciding that RFRA is constitutional as applied to the federal government. *See Adams v. Commissioner of Internal Revenue,* 170 F.3d 173 (3d Cir. 1999); *Alamo v. Clay,* 137 F.3d 1366 (D.C.Cir.1998); and *In re Young,* 141 F.3d 854 (8th Cir.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 43, 142 L.Ed.2d 34 (1998) (finding, on remand from Supreme Court, RFRA constitutional as applied to federal government).

■ RFRA provides that the "[g]overnment may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb–1. Under RFRA, "the claimant must demonstrate a 'substantial burden' on [his] exercise of [his] religious beliefs. If [he] does so, the burden shifts to the government to demonstrate that the regulation or practice at issue furthers a 'compelling interest,' and that it furthers that interest by the 'least restrictive means.' " *Adams, supra* at 176.

■ "To exceed the 'substantial' burden threshold, the governmental [action] must 'significantly inhibit or constrain conduct or expression that manifests some central tenet of a [person's] individual [religious] beliefs; must meaningfully curtail a [person's] ability to express adherence to his or her faith; or must deny a [person] reasonable opportunities to engage in those activities that are fundamental to a [person's] religion." *Werner v. McCotter,* 49 F.3d 1476, 1480 (10th Cir.1995). Plaintiff in the case at bar has satisfied this requirement. He believes that bald and golden eagle feathers have sacramental

value, facilitating communication between the individual and the Great Spirit. The denial of his application for eagle feathers, as a practical matter, makes it impossible for the plaintiff to obtain essential elements for religious worship. Without eagle feathers, he cannot perform a series of religious rites. The government's suggestion that he substitute feathers from another species is anathema to his beliefs, akin to using colored water for sacramental wine. Equally unhelpful is the government's suggestion that he search for pre–1940 feathers. As a practical matter, this is no solution at all. Thus, the court finds that plaintiff has demonstrated that the department's regulation constitutes a substantial burden on the free exercise of his religion.

The next part of the RFRA test is whether the Secretary has established a compelling governmental interest sought to be achieved by requiring applicants to be members of a federally recognized Indian tribe. At the outset, the Secretary notes the obvious and compelling governmental interest that led to BGEPA's enactment: the preservation of two endangered species of eagles, one of which is the symbol of our Nation. *See United States v. Hugs,* 109 F.3d 1375 (9th Cir.1997). The religious purposes exemption, he argues, must be read narrowly so as not to undermine the overall purpose of the act. Next, he cites the preservation of Native American religions and the obligation of the United States to fulfill pre-existing treaty commitments to federally recognized Indian tribes as the two compelling governmental interests at stake.

The Secretary has emphasized that this case does not involve the distribution of religious artifacts to one group of citizens while withholding them from another. Such governmental action would surely run afoul of the Establishment and Free Exercise Clauses. Rather, he contends, this case implicates the political relationship existing between the United States and Indian tribes. From the earliest days of the Republic, the Supreme Court has acknowledged this relationship. In *Chero-* *kee Nation v. Georgia,* 30 U.S. 1, 5 Pet. 1, 8 L.Ed. 25 (1831), Chief Justice Marshall characterized the Cherokees as a "domestic dependent nation." A year later in *Worcester v. Georgia,* 31 U.S. 515, 557, 6 Pet. 515, 8 L.Ed. 483 (1832), he elaborated on this concept, stating that "the several Indian nations [are] distinct, political communities, having territorial boundaries, within which their authority is exclusive...." More recently, the Supreme Court reaffirmed this doctrine in a trilogy of cases, holding that "federal regulation of Indian affairs is not based upon impermissible classifications. Rather, such regulation is rooted in the unique status of Indians as 'a separate people' with their own political institutions." *United States v. Antelope,* 430 U.S. 641, 646, 97 S.Ct. 1395, 1399, 51 L.Ed.2d 701 (1977); *see also Morton v. Mancari,* 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974); and *Fisher v. Dist. Ct. of the Sixteenth Jud. Dist. of Montana,* 424 U.S. 382, 96 S.Ct. 943, 47 L.Ed.2d 106 (1976).

The Constitution expressly provides Congress with the power to "regulate Commerce ... with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3. Laws grounded on this provision have been upheld consistently if shown to be rationally related to a legitimate governmental interest. As noted by the Secretary, BGEPA's religious purposes clause preserves and protects Native American religions. In light of the Constitution's grant of authority in the Indian Commerce Clause, this is a legitimate, compelling governmental interest. At the same time, by providing bald and golden eagle parts to federally recognized Indian tribes, the United States—albeit in a substituted fashion—is fulfilling a pre-existing treaty obligation to the tribes. The right of Indians to hunt and fish in specified areas was a common provision in many treaties. This right, however, was abrogated with BGEPA's enactment. By re-establishing access to resources of religious and cultural import to federally recognized Indian tribes, the United States is demonstrating its fidelity

to the rule of law among nations. Although RFRA does not define "compelling governmental interest," relevant case law suggests that it involves "interests of the highest order." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 546, 113 S.Ct. 2217, 2233, 124 L.Ed.2d 472 (1993). With this definition in mind, the court finds that the Secretary has met his burden of establishing compelling governmental interests.

The final analysis, and perhaps the most crucial under the RFRA test, is whether the requirement that an applicant for eagle parts be a member of a federally recognized Indian tribe is the least restrictive means of furthering the specified governmental interests. This inquiry must be fact specific, but one court has framed the test in this fashion:

> If the compelling state goal can be accomplished despite the exemption of a particular individual, then ·a regulation which denies an exemption is not the least restrictive means of furthering the state interest. A synthesis of the two prongs is therefore the question whether the government has a compelling interest in not exempting a religious individual from a particular regulation.

*Callahan v. Woods,* 736 F.2d 1269, 1272–73 (9th Cir.1984); *see also Harris v. Chapman,* 97 F.3d 499, 503 (11th Cir.1996). Given the importance of BGEPA's goal, exemptions must be construed narrowly so as not to undermine the overall purpose of the statute. Nonetheless, one cannot complete the analysis without examining the compelling governmental interests sought to be achieved by the regulation. Providing bald and golden eagle parts to members of federally recognized tribes is an important step toward preserving the religious heritage of Native Americans. The critical inquiry, however, is whether this goal could be achieved if non-federally recognized Native American tribe members were provided access to eagle parts. Evidence at trial demonstrated that the supply is limited. Testimony indicated the existing waiting period to receive an eagle carcass is between three and three and a

half years. The waiting period for loose feathers—which cannot exceed fifteen per request—is approximately six months. The director of the National Eagle and Wildlife Repository explained that the demand for eagle parts has consistently exceeded available supplies, and members of federally recognized tribes often complain about long delays. This is significant because the inability to obtain eagle parts inhibits the religious practice of Native Americans. Prolonged delay is a serious obstacle. Furthermore, testimony showed that, while it is difficult to calculate exactly how many individuals are similarly situated to the plaintiff, the number is sizeable. Allowing members of non-federally recognized Indian tribes to apply for eagle parts would create difficult issues of proof that would significantly inhibit the implementation of the regulation and the achievement of the compelling governmental interest. Therefore, the court finds that the regulation limiting applicants to members of federally recognized tribes is the least restrictive means of achieving the regulation's compelling interest of preserving and protecting Native American religions. *See also Rupert v. Director, United States Fish and Wildlife Service,* 957 F.2d 32 (1st Cir.1992); *United States v. Lundquist,* 932 F.Supp. 1237 (D.Or.1996).

A second compelling governmental interest is the effort of the United States to fulfill—albeit in a substituted manner—its treaty commitments with federally recognized Indian tribes. The right to hunt and fish in specified areas was commonly recognized in treaties between the United States and Indian tribes. BGEPA's enactment, however, abrogated this right as it pertained to bald and golden eagles. The 1962 religious purposes exemption, acknowledged the hardship that had been imposed and provided a partial remedy, conditioned upon the Secretary determining that it was "compatible with the preservation of the bald and golden eagle." A nation's fidelity to it treaty obligations is a compelling governmental interest. As discussed above, evidence in the case at bar

demonstrates this interest would be vitiated if the limited supply of bald and golden eagle parts were distributed to a wider population than members of federally recognized Indian tribes. In reaching this conclusion, the court is aware that President Clinton has taken steps to remove the American bald eagle from the endangered species list, *see* Jim Carton, *Clinton Administration Plans to Remove Bald Eagles from 'Endangered' List,* Wall St. J., July 6, 1999, at A23, but the impact of this action has yet to be felt upon the supply of available eagle parts.

Accordingly, it is

**ORDERED and ADJUDGED** that the Plaintiff Harvey (Fire Bird) Gibson shall take nothing by this action, and the defendants shall go hence without day.