PUBLISH

F I L E D
United States Court of Appeals
Tenth Circuit

AUG 8 2001

PATRICK FISHER
Clerk

# UNITED STATES COURT OF APPEALS

# TENTH CIRCUIT

In the Matter of: JOSELUIS SAENZ,

      Claimant - Appellee,

vs.

DEPARTMENT OF INTERIOR,

      Defendant - Appellant.

No. 00-2166

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D.C. No. 99-21-M)

Peter Schoenburg (Jerilyn DeCoteau and Larane Arbaugh, Student Attorney, University of Colorado at Boulder, School of Law, Indian Law Clinic, Boulder, Co., on the brief), Rothstein, Donatelli, Hughes, Dahlstrom, Schoenburg & Enfield, Albuquerque, New Mexico, for Claimant - Appellee.

Jared A. Goldstein (Lois J. Schiffer, Assistant Attorney General, Sasha Siemel and E. Ann Peterson, U.S. Department of Justice, Washington, D.C.; Of Counsel: John D. Leshy, Solicitor, Mary Anne Kenworthy, Benjamin C. Jesup and Janet Spaulding, Department of the Interior, Washington, D.C., on the briefs), for Defendant - Appellant.

Before **KELLY**, **MCKAY**, and **MURPHY**, Circuit Judges.

**KELLY**, Circuit Judge.

Defendant-appellant, the United States Department of Interior ("the government") appeals from the district court's order granting Joseluis Saenz's Fed. R Crim. P. 41(e) motion requesting the return of Mr. Saenz's eagle feathers and other related religious items. We have jurisdiction pursuant to 28 U.S.C. § 1291 and we affirm.

Background

Mr. Saenz, the plaintiff-appellee, is descended from the Chiricahua tribe of Apache Indians. Although originally recognized as a tribe by the United States government and restricted to a reservation, the Chiricahua reservation was dissolved in 1886 after the outbreak of warfare between the Apache and the U.S. Aplee. App. at 66-69. After many leaders of the Apache surrendered to the U.S., many Chiricahua, including Mr. Saenz's ancestors, refused to surrender and fled to Mexico. Mr. Saenz's family returned to the U.S. in the 1930s. Aplee. Br. at 5. The Chiricahua Indians are not currently a federally-recognized Indian tribe.

Mr. Saenz follows the beliefs and traditions of the Chiricahua Apache religion and "has traveled throughout North America to dance and participate in Native religious events." Id. Mr. Saenz estimates that before the summer of 1996, he danced in approximately fifteen pow-wows per year. Aplt. App. at 74 (testimony of Mr. Saenz). Eagle feathers are an integral part of his religious

practices.  Id. at 61, 75-77.  In 1996, while New Mexico state officials were executing a search warrant at Mr. Saenz's home, the officers noticed items with eagle feathers hanging on the walls.  [1]  Mr. Saenz had obtained these feathers as gifts.  See e.g., id. at 77, 79, 81-82.  After contacting the United States Fish and Wildlife Service ("FWS") and determining that Mr. Saenz did not have a permit for the feathers, as required by regulations issued under the Bald and Golden Eagle Protection Act ("BGEPA"), 16 U.S.C. § 668, the officers seized the items with eagle feathers and sent them to the FWS office in Albuquerque.  After attempting to get his feathers back through administrative proceedings, Mr. Saenz filed a motion in federal district court under Fed. R. Crim. P. 41(e) for the return of property seized by a search warrant.  In his motion, Mr. Saenz argued that he had a right to possess the eagle feathers under the BGEPA and the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. §§ 2000bb-2000bb-4, as well as under the Free Exercise and Equal Protection Clauses.

The BGEPA prohibits the taking or possession of any bald or golden

---

[1] Mr. Saenz testified that all the eagle feathers that were seized were golden eagle feathers.  Aplt. App. at 63-64.  The items seized from Mr. Saenz were: three eagle feathers, one staff with an eagle foot and seven eagle feathers, one eagle feather with a beaded shaft, one shield with horsehair and four eagle feathers, one fan with twelve eagle feathers, six eagle feathers tied together with rawhide, one small dream catcher with four generic bird "fluffies," one quiver and four arrows with one eagle feather and twelve raptor feathers, one bustle with ninety-four eagle feathers and ten "fluffies," and a framed print with one eagle feather.  Id. at 201-02.

eagles or parts of bald or golden eagles except as permitted by the Secretary of the Interior ("the Secretary"). 16 U.S.C. § 668. The BGEPA authorizes the Secretary to permit the taking, possession, and transportation of eagles and eagle parts in certain circumstances (e.g. scientific and exhibition purposes), including "for the religious purposes of Indian tribes." § 668a. The Secretary is authorized to promulgate regulations for when such permits shall issue, as long as the Secretary has determined that the permits are "compatible with the preservation of the bald eagle or the golden eagle . . . ." Id. The statute does not define the terms "religious purposes" or "Indian tribes."

In 1963, the Secretary first issued regulations establishing a permit program under the "Indian tribes" exception. As originally issued, the regulations provided that permits could be issued "to those individual Indians who are authentic, bona fide practitioners of such religion." See 50 C.F.R. § 11.5 (1964). In 1974, the Secretary revised the regulations, requiring that applicants "attach a certification from the Bureau of Indian affairs that the applicant is an Indian." See 50 C.F.R. § 22.22(a)(5), (6) (1975). Not until 1981, eighteen years after the regulations were first enacted, was the requirement that an applicant be a member of a federally-recognized Indian tribe

clearly articulated. [2] In 1981, after a member of an Indian tribe that was not federally recognized requested a permit for eagle feathers, the Deputy Solicitor of the Interior issued a memorandum which stated that only federally-recognized Indian tribes constituted "Indian tribes" under the BGEPA. Id. at 3-4; Aplt. App. at 189. It was only in 1999 that the regulatory language was changed to clearly reflect the requirement that an applicant must be a member of a federally-recognized Indian tribe. See 50 C.F.R. § 22.22 (1999).

In 1996, the year the FWS seized Mr. Saenz's eagle feathers, the regulations stated that an applicant under the "Indian tribes" exception must provide the FWS: (1) the species and number of eagles or feathers proposed to be taken or acquired by gift or inheritance; (2) the state and local area where the taking is proposed to be done, or from whom acquired; (3) the name of the tribe

---

[2] At oral argument and in its reply brief, the government stated that the requirement that an applicant be a member of a federally-recognized Indian tribe has been in place since 1974. See Aplt. R. Br. at 17. The government asserts that since 1974 the BIA has only issued certificates to those applicants who are members of federally-recognized Indian tribes. However, the government's initial brief implies that the "federally-recognized" requirement was only articulated in 1981, see Aplt. Br. at 3, and the only evidence the government submits on this topic, a 1981 opinion letter from the Office of the Solicitor, see Aplt. App. at 189, supports this latter interpretation. Therefore, we will assume for the purposes of this opinion, that the "federally-recognized" requirement was put in place in 1981, eighteen years after the Secretary first issued regulations under the "Indian tribes" exception to the BGEPA. We also note that, even if the "federally-recognized" requirement had been implemented in 1974, the permit system had already operated for eleven years without such a requirement.

with which the applicant is associated; (4) the name of the tribal religious ceremony(ies) for which the feathers are required; (5) a certification from the BIA that the applicant is an Indian; and (6) a certification from a duly authorized official of the religious group that the applicant is authorized to participate in such ceremonies.   See 50 C.F.R. § 22.22 (1996).  It is uncontested that in 1996 the BIA would only issue the required certification to members of federally-recognized Indian tribes.

In 1999, the regulations were amended to clearly reflect the requirement that the applicant be a member of a federally-recognized Indian tribe.  In addition, the requirement that an applicant submit certification from a duly authorized official of the religious group that the applicant is authorized to participate in the religious ceremonies was dropped. [3]  See 50 C.F.R. § 22.22 (1999).  The current regulations state that in addition to the first four requirements listed in the 1996 regulations, the applicant must attach "a certification of enrollment in an Indian tribe that is federally recognized under the Federally Recognized Tribal List Act of 1994 ("List Act"), 25 U.S.C. 479a-1, 108 Stat. 4791 (1994).   See 50 C.F.R. § 22.22 (2001).  The only requirement that

_____

[3] The FWS regional director for the southwest region testified that in New Mexico, a permit applicant may voluntarily send in a "Certificate of Participation" from a tribal elder which states that the applicant is qualified to participate in the religious ceremony, but that such a certificate is not required. Aplt. App. at 108-09 (testimony of Nancy Kaufman).

the government asserts Mr. Saenz cannot meet is the requirement that the applicant must be a member of a federally-recognized Indian tribe. Neither the government nor Mr. Saenz distinguishes the 1996 version from the current version of the regulations, nor will we. We will assume, for the purposes of this opinion, that in order for Mr. Saenz to have obtained a permit during the relevant time period, he must have been a member of an Indian tribe that is federally recognized under the List Act.

In evaluating requests, the FWS considers: (1) "[t]he direct or indirect effect which issuing such permit would be likely to have upon the wild populations of bald or golden eagles"; and (2) "[w]hether the applicant is an Indian who is authorized to participate in bona fide tribal religious ceremonies." Id.[4] Applications are processed at FWS's regional migratory bird permit offices, and, when approved, are forwarded to the National Eagle Repository in Commerce City, Colorado. The Repository receives eagles and eagle parts and distributes them to persons with valid permits on a first-come, first-serve basis, although some exceptions are made for death ceremonies requiring eagle parts immediately. FWS distributes eagle parts within days of receiving them, but the demand exceeds the supply. On average, successful permit applicants wait three

---

[4] These evaluation criteria were in place throughout the relevant time period.

years for a whole eagle carcass and six to nine months to receive loose feathers. Aplt. Br. at 6; Aplt. App. at 112 (testimony of FWS regional director Nancy Kaufman).

The other statute at issue in this case, RFRA, provides:

Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person–
(1)  is in furtherance of a compelling governmental interest; and
(2)  is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. 2000bb-1(b).   Under RFRA, the plaintiff must first prove that the government's action has substantially burdened a sincerely-held religious belief. United States v. Meyers  , 95 F.3d 1475, 1482 (10th Cir. 1996).   If the plaintiff meets that standard, the burden shifts to the government to prove that recognition of an exception from the statute would impede the government's compelling interests and that the statute furthers those interests by the "least restrictive means."  Id.

In March 2000, the district court issued an order granting Mr. Saenz's Rule 41(e) motion.  Aplt. App. at 194.  The district court based its decision solely on the BGEPA and RFRA and did not reach the constitutional issues.        Id. at 194-95. As for the "Indian tribes" exception under the BGEPA, the district court found that "[w]hile the exception can be read, as argued in this case, as Congress protecting the sovereign-to-sovereign relationship due those Indian tribes the

United States has recognized as politically independent, it can also be viewed as Congress (a) recognizing the importance of the eagle to Indian religious practices generally and (b) taking steps not to inhibit the individual free exercise of religion where the eagle is essential to religious expression and total restriction is unnecessary." Id. at 204. Based on this latter view, the district court held that "[t]he government's refusal to find Saenz to be an Indian practicing an Indian religion ignores plain facts, belittles sincere religious beliefs and unreasonably restricts the access to eagle feathers intended by the exception to the BGEPA." Id. at 208.

As for the permit system itself, the district court found that:

In the end, it appears the present permit system is designed not to enhance the government's position with federally-recognized tribes, to serve tribes' governmental purposes, to implement the statutory exception in the fairest manner possible, or to place the least constraint on the free exercise of religion; the present permit system appears designed to minimize the work Congress has handed the agency. Administrative expediency, however, does not constitute a compelling governmental interest that justifies either intrusion into religious beliefs or regulations which unreasonably restrict express statutory provisions. None of what the government presents in this case justifies denying an Indian practitioner of an Indian tribal religion access to eagle feathers.

Id. at 213.

Under the district court's RFRA analysis, the court found that the government had a single compelling interest, the preservation of bald and golden eagles. Id. at 216. The court held that this compelling interest was not being

furthered by the least restrictive means, stating that:

> [i]n many respects, what the government proposes as justification for its eagle permit regulations does not address the interests of conservation at all. In all respects, the government's approach makes no attempt to accommodate the right of an individual to the free exercise of religion or to recognize the fundamental nature of the eagle to all Native Americans who practice a traditional Indian religion. At best, the eagle permit scheme is not "the least restrictive means" to the necessary end. At worse, it may not be a means to any legitimate end. It fails to take into account mandatory considerations. It constrains the free exercise of religion without cause and it violates [RFRA].

Id. at 217 (emphasis in original).

The government raises two issues. First, the government argues that the district court failed to give deference to the Secretary's reasonable interpretation of the BGEPA's "Indian tribes" exception as required by Chevron, U.S.A., Inc. v. Nat'l Resources Defense Council, Inc., 467 U.S. 837 (1984). Aplt. Br. at 27. Second, the government asserts that restricting eagle permits to members of federally-recognized Indian tribes is the least restrictive means of furthering the government's compelling interests. Id. at 30. The government does not contest that Mr. Saenz is a Chiricahua Indian, a sincere practitioner of the Chiricahua Apache religion, or that the BGEPA substantially burdens his religious beliefs. Id. at 8, 15, 31 n.8. The government's argument is simply that restricting the "Indian tribes" exception to members of federally-recognized tribes is the least restrictive means of furthering the government's compelling interests in eagle conservation and fulfilling its treaty obligations to Indian tribes under RFRA.

Because we hold that the current regulations violate RFRA, we do not reach the Chevron analysis.

## Discussion

We review the grant of a Rule 41(e) motion for an abuse of discretion. United States v. Grover, 119 F.3d 850, 851 (10th Cir. 1997); United States v. Deninno, 103 F.3d 82, 84 (10th Cir. 1996). Under this standard, we do not defer to the district court's legal conclusions. See Koon v. United States, 518 U.S. 81, 100 (1996) ("A district court by definition abuses its discretion when it makes an error of law. . . . The abuse-of-discretion standard includes review to determine that the discretion was not guided by erroneous legal conclusions."). The government states that it "solely challenges the district court's legal conclusions . . . ." Aplt. Br. at 13.

## I. Standing

At the outset, the government argues that Mr. Saenz does not have standing to bring an as-applied challenge to the permit process itself as he failed to actually apply for a permit. Aplt. Br. at 16 (citing United States v. Hugs, 109 F.3d 1375, 1378 (9th Cir. 1997)). Mr. Saenz does not contest that he did not apply for a permit. However, Mr. Saenz argues that because it would have been futile for him to apply for a permit, he nonetheless has standing to bring an as-

applied challenge. See Prayze FM v. FCC, 214 F.3d 245, 251 (2d Cir. 2000) ("This threshold requirement for standing may be excused only where a plaintiff makes a substantial showing that application for the benefit . . . would have been futile.") (internal quotations and citation omitted); Ellison v. Connor, 153 F.3d 247, 255 (5th Cir. 1998) (same); Desert Outdoor Adver., Inc. v. City of Moreno Valley, 103 F.3d 814, 818 (9th Cir. 1996) ("[Appellants]. . . have standing to challenge the permit requirement, even though they did not apply for permits, because applying for a permit would have been futile.") (citation omitted); see also Lac Vieux Desert Band of Lake Superior Chippewa Indians v. Michigan Gaming Control Bd., 172 F.3d 397, 406 (6th Cir. 1999) ("The law recognizes . . . that a plaintiff need not make costly futile gestures simply to establish standing, particularly when the First Amendment is implicated.") (citations omitted).

We agree. As the district court stated, "nothing Saenz presents to the government can establish to the government's satisfaction that he is genuinely Indian. . . .[E]ven though Saenz has produced credible proof that he is Indian and uses eagle feathers as an essential part of the exercise of an Indian religion, the FWS will not consider his evidence." Aplt. App. at 200. Permits are only given to members of federally-recognized Indian tribes–there are no discretionary exceptions. Because Mr. Saenz is not a member of a federally-recognized tribe, his application would have been futile. Therefore, we hold that Mr. Saenz has

- 12 -

standing to bring an as-applied challenge.

II. RFRA

Under RFRA, [5] Mr. Saenz "must establish, by a preponderance of the evidence, three threshold requirements to state a prima facie free exercise claim." Meyers , 95 F.3d at 1482. Mr. Saenz must show that the government has (1) substantially burdened (2) a sincerely-held (3) religious belief. Kikumura , 242 F.3d at 960; Meyers , 95 F.3d at 1482. In this case, the government concedes that Mr. Saenz has established his prima facie case. See Aplt. Br. at 31 n.8 ("The United States does not contest that Mr. Saenz sincerely seeks to possess eagle feathers for religious purposes or that the seizure of his eagle feathers substantially burdens his exercise of religion."). Therefore, the burden shifts to the government to "demonstrate that the challenged regulation furthers a compelling state interest in the least restrictive manner." Meyers , 95 F.3d at 1482 (citation omitted). It is important to note that "under RFRA, a court does not consider the . . . regulation in its general application, but rather considers

---

[5] Although the Supreme Court found RFRA to be unconstitutional as applied to the states, City of Boerne v. Flores, 521 U.S. 507, 536 (1997), we have upheld its constitutionality when applied to the federal government. Kikumura v. Hurley, 242 F.3d 950, 958-59 (10th Cir. 2001).

whether there is a compelling government reason, advanced in the least restrictive means, to apply the . . . regulation to the individual claimant." Kikumura , 242 F.3d at 962 (emphasis added).

A. Compelling Interests

In this case, the government asserts two compelling interests on appeal: eagle conservation and the fulfillment of trust and treaty obligations to the federally-recognized Indian tribes. [6] Aplt. Br. at 31. The district court held that the government only had a single compelling interest in the context of the BGEPA–the conservation of golden and bald eagles. Although we agree that the government has failed to prove its compelling interest in trust and treaty obligations, we disagree with the district court to the extent that we find the record insufficient to determine whether the government still has a compelling

---

[6] Mr. Saenz argues that the government did not assert its alleged compelling interest in the fulfillment of its trust and treaty obligations to the federally-recognized Indian tribes in the district court and, therefore, has waived this argument on appeal. Aplee. Br. at 30. We disagree. Although the government may have phrased its alleged compelling interest in fulfilling treaty obligations to the federally-recognized tribes differently below, the substance of the argument is there and there is no waiver. See Aplt. App. at 214-215 (government's assertion that it had compelling interests "in preserving Indian religious practices by limiting the scarce supply of eagle feathers and parts to the religious practices of members of federally recognized tribes," "preserving and supporting the 'unique legal status' of Indian tribes," and in "[e]nsuring that members of federally recognized Indian tribes continue to have access to eagle feathers") (district court opinion, internal quotations omitted, alteration in original).

interest in eagle conservation.

      1.  <u>Asserted Interest in Trust and Treaty Obligations</u>

In its brief, the government simply asserts that it has a compelling interest in fulfilling trust and treaty obligations to the federally-recognized Indian tribes. The government cites to three Supreme Court cases, <u>Bd. of County Com'rs of Creek County v. Seber</u>, 318 U.S. 705 (1943); <u>Worcester v. Georgia</u>, 31 U.S. 515 (1832); <u>Cherokee Nation v. Georgia</u>, 30 U.S. 1 (1831), all of which support the proposition that the federal government has a general duty to protect the federally-recognized tribes as "domestic dependent nations," <u>Cherokee Nation</u>, 30 U.S. at 17, but do not delineate that duty in any detail. <u>See</u>, <u>e.g.</u>, <u>Seber</u>, 318 U.S. at 715 ("In the exercise of the war and treaty powers, the United States overcame the Indians and took possession of their lands, sometimes by force, leaving them an uneducated, helpless and dependent people needing protection against the selfishness of others and their own improvidence. Of necessity the United States assumed the duty of furnishing that protection and with it the authority to do all that was required to perform that obligation and to prepare the Indians to take their place as independent, qualified members of the modern body politic.").

The government primarily relies on <u>Gibson v. Babbitt</u>, 223 F.3d 1256, 1258 (11th Cir. 2000), which held that the government had a compelling interest

in "fulfilling its treaty obligations with federally recognized Indian tribes" in the context of the BGEPA. The Eleventh Circuit based this result on the district court's analysis that the BGEPA was meant to be a substitute for tribes' abrogated hunting treaty rights. Id. (citing Gibson v. Babbitt, 72 F. Supp. 2d 1356, 1360-61 (S.D. Fla. 1999)). The district court had reasoned that, "by providing bald and golden eagle parts to federally recognized Indian tribes, the United States–albeit in a substituted fashion–is fulfilling a pre-existing treaty obligation to the tribes." 72 F. Supp. 2d at 1360. The district court cited no authority for this conclusion. See 72 F. Supp. 2d at 1360-61. We disagree with this analysis .

We do not think that the purpose of the BGEPA's "Indian tribes" exception is to serve as a statutory substitute for certain abrogated treaty hunting rights. In United States v. Dion , 476 U.S. 734, 743-45 (1986), the Court held that the BGEPA abrogated Native American treaty rights to hunt eagles. Just because the BGEPA abrogated certain rights does not mean that the "Indian tribes" exception to the BGEPA was meant to replace those rights. The plain language of the exception supports this interpretation. The exception is for "the religious purposes of Indian tribes," not for "the hunting purposes of Indian tribes."

It is clear in Dion that the Court was only addressing the issue in front of it–whether the BGEPA had abrogated certain treaty hunting rights, not whether a

member of a federally-recognized tribe should have priority over other Native Americans in obtaining eagle feathers for religious purposes. The Court stated:

> Congress expressly chose to set in place a regime in which the Secretary of the Interior had control over Indian hunting, rather than one in which Indian on-reservation hunting was unrestricted. Congress thus considered the special cultural and religious interests of Indians, balanced those needs against the conservation purposes of the statute, and provided a specific, narrow exception that delineated the extent to which Indians would be permitted to hunt the bald and golden eagle.

Id. at 743-44. We do not think that Dion can be read to give a religious preference to one group of Native Americans over another, especially as the Court specifically stated that it was not considering any religious freedom issues. Id. at 736 n.3. In addition, as the analysis of the legislative history behind the BGEPA makes clear, Congress was concerned only with the hardship a complete ban on possessing eagle parts would impose on Native American religious ceremonies, not on treaty hunting rights. See Dion, 476 U.S. at 740-44 (discussing legislative history).

Other than citing to the above cases in its brief, the government introduces no record evidence to prove what the federal government's "trust and treaty" obligations actually are, or whether they encompass providing federally-recognized Indian tribes with eagle parts for religious practices. As the district court points out, the government's trust and treaty obligations usually encompass "a duty to tribal government and a need to acknowledge tribal sovereignty . . . ."

- 17 -

Aplt. App. at 215. However, in this case, "[t]he issue to be decided is not the legitimacy of sovereign-to-sovereign relationships. This is an end only tangentially tied to the BGEPA in the first place. The ultimate issue in this case centers on the rights of an individual, not as against tribal governments, but as against the United States." Id. Because we are not persuaded by the Eleventh Circuit's reasoning in Gibson and because the government offers us no evidence to the contrary, we hold that the government has failed to prove that it has a compelling interest in fulfilling trust and treaty obligations in this context.

### 2. Alleged Interest in Eagle Conservation

The district court found the government's compelling interest in eagle conservation undisputed. Aplt. App. at 214. Certainly, case law seems to support this proposition. See, e.g., Gibson, 72 F. Supp. 2d at 1360 (finding a compelling interest in eagle preservation), aff'd, 223 F.3d 1256 (11th Cir. 2000) (failing to reach the issue but affirming on other grounds); United States v. Hugs, 109 F.3d 1375, 1378 (9th Cir. 1997); United States v. Lundquist, 932 F. Supp. 1237, 1241 (D. Ore. 1996); United States v. Thirty Eight (38) Golden Eagles or Eagle Parts, 649 F. Supp. 269, 276-77 (D. Nev. 1986), aff'd, 829 F.2d 41 (9th Cir. 1987); see also Rupert v. Director, United States Fish & Wildlife Serv., 957 F.2d 32, 35 (1st Cir. 1992) (finding that the government has a "legitimate governmental interest[]" in "protecting a dwindling and precious eagle

population"). However, the above cited cases, with the possible exception of Lundquist ,[7] assumed the compelling governmental interest in eagle conservation existed without evidentiary analysis. [8] The record in this case is insufficient to allow us to conduct a thorough inquiry. However, because this issue is unnecessary to our disposition of the case, the inadequacy of the record is not dispositive. Even if the government has a compelling interest in eagle conservation, the government is not furthering that interest by the "least restrictive means." 42 U.S.C. § 2000bb-1(b)(2).

B. Least Restrictive Means

Assuming that the government has a compelling interest in eagle conservation, under RFRA the government must prove that denying Mr. Saenz

---

[7] The court in Lundquist based its finding that the government had a compelling governmental interest in eagle preservation on a 1995 case, United States v. Jim, 888 F. Supp. 1058, 1064 (D. Ore. 1995). According to the Jim court, the fact "[t]hat the bald eagle is making a rebound does not mean that the government does not maintain a compelling interest in its protection. There is no proposal to delist the bald eagle anywhere in the country . . . ." Id. (citations omitted). As discussed in note 8, there is now such a proposal.

[8] We note two things. First, the golden eagle is not endangered. However, because young golden eagles are very difficult to distinguish from young bald eagles, and the two species are frequently confused, Congress included the golden eagle within the protection of the BGEPA. See Aplt. Br. at 2 (citing Jim, 888 F. Supp. at 1063). Second, in 1999, the FWS proposed a rule to remove the bald eagle from the List of Endangered and Threatened Wildlife in the lower forty-eight states. Proposed Rule to Remove the Bald Eagle in the Lower 48 States from the List of Endangered and Threatened Wildlife , 64 Fed. Reg. 36454 (July 6, 1999) (stating that "available data indicate that this species has recovered").

his eagle feathers "is the least restrictive means of furthering that compelling governmental interest." Id. The government argues that restricting permits to members of federally-recognized tribes meets this test for two reasons: (1) "[a]llowing all persons of Indian heritage to possess eagle feathers, without regard to membership in a recognized tribe, would undermine the United States' obligations to the recognized tribes," Aplt. Br. at 33; and (2) "significantly increasing the number of persons authorized by law to possess eagle parts and feathers would harm the United States' interest in protecting eagle populations, as it would likely lead to increased numbers of illegal eagle kills and increased reliance on a black market for eagle parts." Id. at 35. Finally, the government contends that deleting the federal recognition requirement from the permit process would lead to equal protection and administrative concerns. We are not persuaded by any of these arguments.

1. Obligation to Federally-Recognized Tribes

As we have already stated, the government has failed to define the United States' obligations to the recognized tribes in this context. As the district court succinctly summarized, "the government has no compelling interest in preferring the practices of any one Indian tribe over another on the basis of unrelated distinctions in political status." Aplt. App. at 218. Therefore, this argument cannot serve as a justification for the current permit system.

Furthermore, we note that even if the government had proved that it had an obligation to favor federally-recognized tribes in this context, the government failed to prove at the motion hearing that this interest would be undermined if Mr. Saenz prevails. The government's basic argument is that opening the permit process to all Native Americans, regardless of the political status of their respective tribes, would swamp the permit process and create much longer delays than already exist for eagle parts and feathers. Aplt. Br. at 33-34. However, the government offered very little proof on this issue, and the district court found that the government was not arguing from "a factual basis." Aplt. App. at 217. Because the government only appeals the district court's legal conclusions, see Aplt. Br. at 13, the district court's factual findings stand unchallenged.

Other than speculative opinion testimony by an FWS regional director and a member of the Mescalero Apache tribe that the deletion of the federally-recognized requirement would cause the wait for eagle parts and feathers to substantially increase, Aplt. App. at 112-13; Aplee. App. at 37-38, the government offered two other items of evidence: (1) an estimate of the number of members of federally-recognized tribes versus the number of Americans who identify themselves as having Indian ancestry, [9] see Aplt. App. at 134 (testimony

_____

[9] According to testimony at the motion hearing, there are approximately 1.7 million members of federally-recognized Indian tribes. There are approximately 8.7 million Americans who identify themselves as having Native American

- 21 -

of Iris Drew, Bureau of Indian Affairs), and (2) a report showing the number of eagle orders filled for a one-year period from 1997 to 1998. Id. at 187. The government seems to believe that showing that there are substantially more Americans who identify themselves as having Native American ancestry than there are members of federally-recognized Indian tribes proves that the permit process would be overwhelmed with applications in the absence of the federal recognition requirement. It does not. As the district court stated, this is simply "conjecture." Aplt. App. at 209.

Not all of the millions of Americans who identify themselves as having Native American ancestry are sincere practitioners of Native American religions that require eagle parts and feathers. We note that the permit process operated for eighteen years without the requirement that the applicant be a member of a federally-recognized tribe. See supra, note 2. If that method of operation led to such great demand that the permit system was overwhelmed, the government should have been able to offer evidence to that effect from that period. No such evidence is included in the record. Finally, the report showing the number of eagle orders filled in a one-year period from 1997 to 1998 sheds no light on how circumstances would change if the requirement that an applicant be a member of

ancestry. Aplt. Br. at 34 (citing 60 Fed. Reg. 44,674, 44,679 (1995) (census data)).

a federally-recognized tribe were eliminated. [10]

## 2. Illegal Eagle Kills and Black Market Transactions

Turning to the government's argument that the current permit system is necessary to prevent an increase in illegal killings of eagles and black market transactions, the government has failed to offer any proof on either point, nor have they shown that a black market in eagle parts even exists. At base, the government's argument is that the permit system affects the overall demand for eagle feathers. Common sense points to the flaws in this argument. At any one point in time, there are a fixed number of Native Americans who are sincere practitioners of Native American religions and who consider eagle feathers to be an integral part of their religious practices. It is these Native Americans–some of whom are members of federally-recognized tribes and some of whom are not–that create the demand for eagle feathers for religious purposes. The way the permit system is structured does not affect that demand, which exists regardless of whether the Secretary's permit system encompasses all Native Americans or only a specific subset ( i.e., members of federally-recognized tribes). Allowing Native

---

[10] Although the FWS regional director testified that the FWS has an average of 4,500 permit applications pending at any one time, Aplt. App. at 112, the report seems to indicate a more rapid rate of order fulfillment. During the one-year period covered by the report, the FWS received 1,070 new requests for eagles and eagle parts. The report indicates that during that same time period, the FWS filled 1,190 orders for eagles and eagle parts. Aplt. App. at 187.

Americans, regardless of their tribal status, who are sincere practitioners of a Native American religion, to obtain a permit would result in a    redistribution   of eagle permits–not in increased demand for them.  Given that the demand for eagles and eagle parts is constant regardless of the permit system, it does not follow that the number of illegal kills and transactions on the alleged black market would increase if the system were altered.

In fact, one could just as easily argue that opening up the permit process to all Native Americans, instead of just those who are members of federally-recognized tribes, would   decrease  the number of illegal eagle kills and black market transactions.  Currently, a Native American who is not a member of a federally-recognized tribe has no method within his or her control of obtaining eagles for religious ceremonies other than through the black market.  By changing the permit system, these same Native Americans would be eligible to obtain eagle parts in a legal way.

### 3. Equal Protection and Administrative Concerns

The government asserts two final arguments against the conclusion that restricting the permit process to members of federally-recognized Indian tribes does not meet the "least restrictive means" test under RFRA.  The government argues that opening up the permit process to all Native Americans who are sincere practitioners of a Native American religion will not only raise equal

protection problems, but will make the permit process administratively unfeasible. See Aplt. Br. at 24-26, 34 n.10. We disagree.

The government asserts that opening up the permit process to all Native Americans, regardless of membership in a federally-recognized tribe, would result in a permit system that relied on an impermissible racial classification. The government bases this argument on Morton v. Mancari, 417 U.S. 535 (1974), in which the Court held that a BIA employment preference for applicants that were "one-fourth or more degree Indian blood and . . . a member of a Federally-recognized tribe" was "political rather than racial in nature." Id. at 553 n.24 (internal quotations and citation omitted). As the Court explained, "[t]he [employment] preference, as applied, is granted to Indians not as a discrete racial group, but, rather, as members of quasi-sovereign tribal entities whose lives and activities are governed by the BIA in a unique fashion." Id. at 554. Therefore, the government argues that, in this case, removing the requirement that an applicant be a member of a federally-recognized tribe would lead to an impermissible racial classification. However, we believe the context to be critical here. The Morton Court was solely concerned with issues of tribal sovereignty, stating that the preference was "rationally designed to further Indian self-government . . . ." Id. at 555. In this case, we are dealing with an individual's free exercise rights. Accordingly, Morton does not dictate our

- 25 -

result.

Even the government admits that "there may be occasions when it is defensible for the government to rely on ancestry in determining a person's status as an Indian . . . ." Aplt. Br. at 25. We believe that this is one of those occasions. As the district court in Gibson stated, "Congress is very aware of its trust obligation to Native Americans and, in fulfillment of this obligation, often confers benefits on Indians irrespective of their membership in a federally recognized tribe." 72 F. Supp. 2d at 1358.

The definition of "Indian" contained within the Indian Reorganization Act of 1934 ("IRA"), 25 U.S.C. § 476 et seq., for example, "shall . . . include all other persons of one-half or more Indian blood." 25 U.S.C. § 479. Native Americans meeting this definition are eligible for tuition loans for vocational and trade schools, § 471, and receive certain federal service employment preferences. § 472. Scholarship and grant programs for Native Americans under the Indian Health Care Improvement Act ("IHCIA"), 25 U.S.C. § 1603 et seq., broadly define the term "Indian" to include "any individual who . . . irrespective of whether he or she lives on or near a reservation, is a member of a tribe, band, or other organized group of Indians, including those tribes, bands, or groups terminated since 1940 [ i.e., no longer federally-recognized] and those recognized now or in the future by the State in which they reside, or who is a descendent, in

the first or second degree, of any such member, . . . ." § 1603(c). If Congress may include Native Americans who are not members of federally-recognized tribes within the scope of educational and federal employment programs, surely Congress may do the same when it comes to protecting Native Americans' ability to practice their traditional religions.

Although the government admits that restricting the eagle permit program to members of federally-recognized tribes can result in a "collision of the heart and the mind," Aplt. Br. at 15 (quotations and citation omitted ), underlying the government's entire argument is the premise that this restriction is justifiable because it provides an independent, neutral criteria in determining which Native Americans are allowed to possess eagle feathers. We take issue with this contention. For approximately sixty years (1871-1928), the federal government conducted an official policy of "assimilation" towards Native Americans, which resulted in a "systematic attempt to eradicate Indian heritage and tribalism." Felix S. Cohen, Handbook of Federal Indian Law 127-143 (1982 ed.). The 1950s saw an official policy of "termination," in which the federal government sought to end the "trust relationship" between the federal government and Indian tribes, and Congress voted to "terminate" numerous tribes. Id. at 152-75. An "important practical effect of termination was to remove the sovereignty of terminated tribes. Although the termination acts did not expressly extinguish the

governmental authority of such tribes, most were not able to exercise their governmental powers after the loss of their land base." <u>Id.</u> at 175.

Overall, "[f]ederal policy toward the recognition of Indian tribes has been by no means consistent with 'real' ethnological principles: Congress has frequently consolidated previously distinct groups into a single tribe for recognition purposes, or has divided an individual tribe into two or more groups, recognizing each in turn as a 'different' Indian 'nation.' Congress has also occasionally 'terminated' tribes' federal recognition, in some cases only to 'restore' it thereafter . . . ." Christopher A. Ford, "Executive Prerogatives in Federal Indian Jurisprudence: The Constitutional Law of Tribal Recognition," 73 Denv. U. L. Rev. 141, 156 (1995) (citations omitted), <u>quoted in</u> Aplt. App. at 207 (district court opinion). Mr. Saenz's tribe, the Chiricahua Indians, was once a federally-recognized tribe with its own reservation. That status was revoked, however, when the federal government dissolved the Chiricahua reservation in 1886 after the outbreak of warfare between the Apache and the United States. Aplee. App. at 66-69 (Executive Orders creating and dissolving Chiricahua reservation). It has largely been the federal government's policies toward the Indian tribes over the years that have determined which tribes have survived and which tribes have not. On the one hand, historical government policy toward the Chiricahua tribe may have made it impossible for that tribe to obtain federal

recognition today, while on the other hand, the government now wants to use that same lack of recognition to infringe on Mr. Saenz's religious freedom. We refuse to base Mr. Saenz's free exercise rights on such tenuous ground.

Congress has explicitly declared a policy "to protect and preserve for American Indians their inherent right of freedom to believe, express, and exercise the traditional religions of the American Indian, . . . including but not limited to access to sites, use and possession of sacred objects, and the freedom to worship through ceremonials and traditional rites." The Indian Religious Freedom Act, 42 U.S.C. § 1996. Against this background, we do not believe that Mr. Saenz's free exercise rights should be conditioned on his "political" status–whether or not he is a member of a federally-recognized tribe.

Finally, the government alleges that allowing Mr. Saenz and others like him to obtain eagle permits will result in a permit system that is administratively unfeasible. As explained, the government has offered no proof that the number of permit applicants would substantially increase in the absence of the challenged restriction, and we cannot ignore the fact that the government operated the permit system for eighteen years without requiring an applicant to be a member of a federally-recognized tribe. See supra, note 2. The government operates programs for Native Americans under the IRA and IHCIA that do not require participants to be members of federally-recognized tribes. Presumably, the

government has found a way to allocate the limited resources in those programs (scholarship funds and grants) among the programs' applicants. The government will have to do the same here. As the district court stated, "[t]he federal government may find it difficult, time-consuming or bothersome to identify authentic Indian tribes ethnologically rather than simply politically, but the present test will never provide for the individual free exercise of religion precisely because of cases like the present one and because whether or not a particular tribe has been formally recognized for political purposes bears no relationship whatsoever to whether or not an individual practitioner is of Indian heritage by birth, sincerely holds and practices traditional Indian religious beliefs, is dependent on eagle feathers for the expression of those beliefs, and is substantially burdened when prohibited from possessing eagle parts." Aplt. App. at 218.

AFFIRMED.